UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

RECEIVED
NOV 14 2017
CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

[UNDER SEAL],

Plaintiff,

v.

[UNDER SEAL],

Defendants.

Case No.

COMPLAINT

17-SC-5103 DWF/TNL

**FILED IN CAMERA AND UNDER SEAL**
**PURSUANT TO 31 U.S.C. §3730(b)(2)**

### DOCUMENT TO BE KEPT UNDER SEAL

Nola J. Hitchcock Cross
Cross Law Firm, S.C.
The Lawyers Building
845 N. 11th Street
Milwaukee, WI 53233
Phone: (414) 224-0000
Fax:   (414) 273-7055
Email: njhcross@crossalawfirm.com

Marcella Auerbach, Esq.
Nolan Auerbach & White P.L.
435 N. Andrews Avenue, Suite 401
Ft. Lauderdale, FL 33301
Phone: (954) 779-3943
Fax: (954) 779-3937
Email: Marcella@WhistleblowerFirm.com

Susan M. Coler, Esq.
Halunen Law
IDS Center
80 South 8th Street #1650
Minneapolis, MN 55402
Phone: (612) 260-5383
Fax:   (612) 605-4099
Email: coler@halunenlaw.com

Attorneys for [under seal]

SCANNED
NOV 14 2017
U.S. DISTRICT COURT MPLS

1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

NOV 14 2017

|  |  |
|---|---|
| UNITED STATES of AMERICA, and THE STATE OF MINNESOTA, *ex rel.* CAMI LANE,  |  |

Plaintiffs and Relator,

FILED IN CAMERA AND UNDER SEAL

Civil Action File No.: 17-SC-5103
DWF/TNL

v.

Jury Trial Demanded

REHABAUTHORITY MOORHEAD, LLC,
REHABAUTHORITY THIEF RIVER FALLS,
LLC,

PHYSICAL REHABILITATION NETWORK,
LLC,
PHYSICAL REHABILITATION NETWORK
HOLDINGS, LLC
REHABAUTHORITY, LLC,
IDAHO REHABILITATION PARTNERS,
LLC,

REHABAUTHORITY CALDWELL LLC,
REHABAUTHORITY EAGLE LLC,
REHABAUTHORITY HOMEDALE, LLC,
REHABAUTHORITY KUNA LLC,
REHABAUTHORITY OVERLAND LLC,
REHABAUTHORITY NAMPA LLC,
REHABAUTHORITY STAR, LLC,
REHABAUTHORITY SUNNYSIDE LLC,
REHABAUTHORITY WOODRUFF LLC.

REHABAUTHORITY AUTUMN FIELDS
LLC,
REHABAUTHORITY DEMERS LLC,
REHABAUTHORITY UNIVERSITY TOWN
CENTER LLC,

SCANNED
NOV 14 2017
U.S. DISTRICT COURT MPLS

REHABAUTHORITY CHEYENNE, LLC,

KEVIN HULSEY, DPT,
H CORP.

GALEN DANIELSON, DPT,
JIGGSY, INC.,

ADAM COPE, DPT,
CHILE, INC.,

MATTHEW SMITH, DPT,
CRAZYBEARTOOTH, INC.,

NICHOLE WALKER, DPT,
NIKK INC.,

AMY ROE, and

PREMIER BILLING SOLUTIONS, LLC,

Defendants.

## FALSE CLAIMS ACT COMPLAINT

## Table of Contents

I.    GENERAL INTRODUCTION ........................................................... 6

II.   INTRODUCTION TO THE FRAUD ................................................. 7

III.  STATEMENT OF THE CASE ........................................................ 11

IV.   FEDERAL JURISDICTION AND VENUE ..................................... 12

V.    PARTIES ........................................................................................ 13
      A. Relator ..................................................................................... 13
      B. Government Plaintiffs .............................................................. 13
      C. Corporate Defendants ............................................................. 14
           1.    Corporate Entities .......................................................... 14
           2.    Individual Clinic Entities ............................................... 15
           a.    Minnesota ....................................................................... 15
           b.    Idaho ............................................................................... 16
           c.    North Dakota .................................................................. 18
           d.    Wyoming ......................................................................... 19
      D. Individual Defendants and Their Holding Companies ............ 19

VI.   APPLICABLE LEGAL AUTHORITY ............................................ 22
      A. False Claims Act ....................................................................... 22
      B. Minnesota False Claims Act ..................................................... 23
      C. The Medicare and Medicaid Program and Payment of Claims for
          Outpatient Physical Therapy Services under Medicare Part B and Other
          Federal Healthcare Programs.................................................. 23
           1.    Medicare and Medicaid Enrollment Process, Participation
                 Requirements, and Provider Agreements. .................... 26
           2.    Medicare Submission of Certified Claims for Payment .... 29
           3.    Specific Minnesota and Federal Payment Requirements.... 30
           4.    Outpatient Therapy Billing and Coding Rules and Regulations.... 33

VII.  FACTUAL BACKGROUND ........................................................... 35
      A. Relator Cami Lane...................................................................... 35

B. Defendants' Organizational Structure ................................................. 39

C. Defendants' Operational Structure................................................. 44

VIII. DEFENDANTS' FRAUDULENT CONDUCT ................................................. 49

A. Introduction to Defendant RehabAuthority's Multiple Fraud Schemes ... 49

B. RehabAuthority's Overbilling Scheme: Submitting Claims for One-on-One Therapy Units Not Actually Provided ................................................. 51

    1.    General Description ................................................. 51

    2.    Minnesota ................................................. 56

    3.    Idaho ................................................. 62

    4.    North Dakota ................................................. 65

    5.    Upper Management................................................. 67

C. RehabAuthority's Fraudulent Billing for Services Performed by Non-Credentialed Personnel and Supported by Records Falsely Indicating Services Provided by Licensed, Credentialed Therapists. ................................................. 70

D. Defendant's Illegal Waiver of Beneficiary Co-Payments and Deductibles 79

E. RehabAuthority's  Intentionally Indiscriminate Use of Unbundling Modifiers................................................. 83

F. RehabAuthority's Failure to Return Identified Medicare Overpayments Within 60 days................................................. 90

G. RehabAuthority and Premier Billing Solutions' Conspiracy to Submit False Claims for Payment, Falsify Records in Support of False Claims, and Conceal Overpayments................................................. 94

IX. COUNTS ................................................. 96

COUNT ONE VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT 31 U.S.C. § 3729(a)(1)(A) ................................................. 96

COUNT TWO False Claims Act, 31 U.S.C. § 3729(a)(1)(A) False Claims for "Unbundled" Services Not Actually Provided in Separate Time Periods ....... 97

COUNT THREE False Claims Act, 31 U.S.C. § 3729(a)(1)(B)........................... 98

COUNT FOUR False Claims Act, 31 U.S.C. § 3729(a)(1)(C) ............................ 98

COUNT FIVE False Claims Act, 31 U.S.C. § 3729(a)(1)(G)............................... 99

COUNT SIX Minnesota False Claims Act, Minn. Stat. § 15C.02(a)(1),(2),and (3) ................................................. 100

X. PRAYER FOR RELIEF................................................. 102

## I.   **GENERAL INTRODUCTION**

1.      Relator Cami Lane brings the action on behalf of the United States of America for treble damages and civil penalties arising from Defendants' fraudulent conduct in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA") and involving claims made to and paid by the Government's healthcare programs including Medicare and Medicaid for outpatient physical and occupational therapy.

2.      The primary fraud schemes set forth in great detail below are 1) billing the government for individual one-on-one therapy, while actually spitting the service to two or even three patients who are scheduled and treated at the same time; 2) improperly billing for unbundled services; and 3) billing for therapy provided by individuals who are not licensed therapists eligible to performed the services billed to the Government.

3.      This action is also brought under the respective *qui tam* provisions of the False Claims Act of the State of Minnesota on behalf of the State of Minnesota.  The State of Minnesota, together with the United States, are hereinafter referred to as the "Government" when reference is made to them collectively.

4.      The pervasive unlawful conduct described herein began at least six (6) years before the filing of this complaint and has continued to date with no sign of abatement.

II.   **INTRODUCTION TO THE FRAUD**

5.      As the cost of surgical intervention and inpatient care rises, the number of

Americans seeking treatment from outpatient physical and occupational therapy clinics as

an alternative to going "under the knife" has risen dramatically. Generally equipped with

the same credentials and training as their inpatient counterparts, outpatient physical

therapy providers offer patients more flexible treatment plans and schedules as well as

the convenient ability to work on exercises from home, for free. Harris Williams & Co.,

*Physical Therapy Market Overview*, February 2014, *available at*

http://www.harriswilliams.com/system/files/industry_update/2014.2.17_physical_therapy
_overview.pdf.

6.      With the Medicare population continuing to grow and Medicaid

beneficiaries increasingly limited to less expensive outpatient alternatives, the number of

patients who are turning to the rapidly growing, highly fragmented, and extremely

competitive $30 billion outpatient therapy industry for receipt of their Government-

funded healthcare services continues to increase. According to a multi-year study

commissioned by the Department of Health and Human Services' ("DHHS") Center for

Medicare and Medicaid ("CMS"), Medicare expenditures for outpatient therapy services

alone in 2010 totaled $5.6 billion, a 37.4% increase from 2006 reflecting a "rapidly

growing percentage of overall Medicare expenditures." Dever, *et al.*, RTI International,

*Developing Outpatient Therapy Payment Alternatives: Final Report*, 3 (February 2014).

https://www.cms.gov/Medicare/Billing/TherapyServices/Downloads/DOTPA-Final-
Report.pdf

http://www.harriswilliams.com/system/files/industry_update/2014.2.17_physical_therapy
_overview

7.      To protect the availability of Medicare for future generations, CMS limits
the amount of therapy that it will pay by imposing *annual*, per-beneficiary "therapy caps"
with exceptions applicable only when services costing more than the cap are properly
documented as "medically necessary." *See* CMS, *Medicare Claims Processing Manual*,
(Dec. 2, 2016) ch. 5 §§ 10.2 – 10.31

8.      Payment by the Government health programs for outpatient physical
therapy beyond the cap for each individual beneficiary triggers a "manual medical
review" ("MMR") of medical necessity by CMS only when a certain amount over the
cap—called the "threshold" amount—is exceeded. The 2017 "therapy cap" and
"threshold" amounts are $1,980 and $3,700, respectively. *See* CMS, *Medicare Limits on
Therapy Services*, (January 2017), https://www.medicare.gov/pubs/pdf/10988-Medicare-
Limits-Therapy-Services.pdf. Accordingly, the documentation in support of the medical
necessity of amounts *between* the cap and threshold amounts is not typically reviewed
by Medicare or Medicare contractors.

9.      Outpatient therapy, particularly when significant numbers of Government
beneficiary patients are involved, is a volume-based business that depends on a reliable
referral base, a successful marketing strategy, and a tightly managed patient schedule to
bill as much therapy per therapist as possible in order to reap significant and increasing
profits.

10.     Perhaps no outpatient therapy clinic in the nation understands the importance of patient volume in generating profits more than **Defendant RehabAuthority**, whose executive officers and equity members, **Defendants Kevin Hulsey, Galen Danielson, Adam Cope, Matthew Smith**, and **Nikki Walker**, with the knowing assistance of billing company **Defendant Premier Billing Solutions** and its founder and Chief Executive Officer, **Defendant Amy Roe**, have created and maintained a culture of and commitment to calculated overbilling fraud against the Government.  In their scheme, out-patient physical and occupational therapy providers are continuously encouraged and financially incentivized to place "breaking their all-time visit record" and revenue generation over both the quality of their patients' care and their contractual obligations to government healthcare programs. Defendants' high-volume billing scam has been lucrative for them and very costly to the taxpayers.

11.     In order to follow corporate policy and directives from executives who dangle "bonus points" tied to compensation, as well as the prospect of profit-sharing and clinic ownership, as incentives, Defendant RehabAuthority's providers, pressured by a corporate management structure with no compliance department, defraud Medicare, Medicaid, and Tricare as well as other general healthcare programs by **(1)** double-booking and sometimes triple-booking beneficiaries, but billing for the therapy as if it was provided entirely one-on-one, **(2)** indiscriminately applying "modifier 59" in order to "unbundle" services to increase reimbursement despite the lack of any documentation indicating the services were in fact provided separately; and **(3)** maintaining "efficiency" by utilizing the services of personnel without Medicare credentials, or, in many cases,

9

without any medical credentials whatsoever, and falsely documenting and billing the services as if they provided by a credentialed provider. Defendants RehabAuthority and Premier Billing Solutions also have also conspired to **(4)** provide "deals" in the form of co-payment waivers to induce beneficiaries to obtain therapy services as well as to **(5)** conceal and retain Medicare and Medicaid overpayments well beyond sixty (60) days from identification of such overpayments.

12.     These schemes, particularly the double-booking scheme and the illegal use of improperly credentialed personnel, not only deny beneficiaries the benefit of their bargain, but also pose a serious risk to patients in need of therapy. When a therapist's attention is divided or when therapy is entrusted to an individual with no therapy training, misdiagnoses and injury inevitably increase.

13.     In addition, patient beneficiaries requiring, but not receiving, one-on-one physical therapy may not recover as quickly or as completely, potentially costing the taxpayers more healthcare dollars to resolve neglected physical impairments in the future.

14.     Falsified medical records, showing lengthy individual one-on-one therapy, when little was actually provided, also may be medically harmful to Government beneficiaries whose family physicians may feel they are not properly recovering through physical therapy and thus recommend surgery.  Such beneficiaries would be physically harmed by having to undergo unnecessary surgery and in turn the Government healthcare programs would be required to pay for surgery that resulted from fraudulent medical records and lack of necessary physical therapy.

### III.   **STATEMENT OF THE CASE**

15.     This is a *qui tam* action against Defendants Idaho Rehabilitation Partners, LLC., RehabAuthority, LLC, their executive management, and their commonly owned and managed clinic locations (collectively "RehabAuthority"); Physical Rehabilitation Network, LLC. and Physical Rehabilitation Network Holdings, LLC; and Premier Billing Solutions, LLC and its Chief Executive Officer to recover damages and civil penalties on behalf of the United States of America and the State of Minnesota arising from the false and/or fraudulent records, statements, and claims made or caused to be made for physical therapy services not actually provided in violation of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA"), and the Minnesota False Claims Act ("MFCA"), Minn. Stat. §§ 15C.01 *et seq.*

16.     As summarized in part II above and described in detail below, from at least January 2010 to the present and continuing, Defendants engaged in and continue to engage in a scheme to create false records and to cause the submission of false claims to Government health programs, including Minnesota's "Medical Assistance" Medicaid program, for **(1)** therapy services not actually provided; **(2)** unbundled therapy services without documentation confirming that such services were actually provided separately; **(3)** services provided by non-credentialed and/or non-licensed personnel; and **(4)** services provided pursuant to illegal inducements provided to "family and friends" and other beneficiaries who were given "deals" in the form of waived beneficiary co-pays and deductibles. In addition, Defendants **(5)** ordered the falsification of billing records in

11

order to conceal their routine practice of retaining Medicare overpayments more than 60 days after the overpayments are known and identified.

17.     Specifically, Defendants operate two physical therapy clinics located in this District, including its second largest clinic overall, where physical therapy services are provided to hundreds of patients who reside in Minnesota for which Defendants cause claims for payment to be submitted to the State of Minnesota Department of Human Services.

18.     Critical to the conspiracy to design and implement of all five of these schemes is Defendant Premier Billing Solutions ("PBS"), which, through its close operational relationship with the corporate and local management of RehabAuthority, by far one of its largest clients, knowingly submits RehabAuthority's false claims for payment and, in some cases, instructs RA employees to create false records to support its false claims.

## IV.    FEDERAL JURISDICTION AND VENUE

19.  The acts prohibited by 31 U.S.C. § *3729 et seq.* and set forth with particularity herein occurred in Minnesota and elsewhere, as the Defendants do business in multiple other states throughout the United States. Therefore, the court has jurisdiction over this case pursuant to 31 U.S.C. § 3732(a) as well as under 28 U.S.C. § 1345. This court has supplemental jurisdiction over this case for the claims brought on behalf of the State of Minnesota pursuant to 31 U.S.C. § 3732(b) and/or 28 U.S.C. § 1367, inasmuch as recovery is sought on behalf of the United States.

20.  Venue is proper in the District pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. § 1391(b) and (c), because the Defendants transact business in this District and one or more of the acts committed by the Defendants and prosecuted by 31 U.S.C. § 3729 occurred in this District.

21.  Relator has provided previously to the Attorney General of the United States and the Attorney General for the State of Minnesota a statement of all material evidence and information related to the Complaint pursuant to 31 U.S.C. § 3730(b)(2) and Minn. Stat. §§ 15C.05(e). Relator also on October 19, 2017 provided notice of her intent to file this action to the Minnesota United States Attorney's Office.

## V.    PARTIES

### A. Relator

22.    **Relator,** Cami Lane, is a citizen of the United States of America and a resident of the State of Idaho, residing in the City of Wilder. Lane, who worked for Defendant RehabAuthority from January 13, 2010 until July 16, 20178 as a Front Office Coordinator and Data Checker, brings this action based upon her independent and direct knowledge. Relator brings this action on behalf of the **United State of America** pursuant to 31 U.S.C. § 3730(b)(2) and on behalf of the **State of Minnesota** pursuant to Minn. Stat. §§ 15C.01 *et seq.*

### B. Government Plaintiffs

23.    **The United States of America**, through its Department of Health & Human Services ("DHS") and Centers for Medicare and Medicaid Services ("CMS"), TRICARE and other healthcare agencies and programs, administers and regulates

payments funded by the federal Medicare program and the State/Federal Medicaid program and other federal programs. These federally-funded healthcare programs are hereinafter referred to as "Government Healthcare Programs."

24.     **The State of Minnesota** through its Department of Human Services, administers and, in conjunction with the Federal government, funds medical services provided as part of the state's Medical Assistance program (hereinafter referred to as "Medicaid").

## C. Corporate Defendants

### 1. Corporate Entities

25.     **Physical Rehabilitation Network, LLC** is a Delaware limited liability company with a principal place of business located at 5962 La Place Court, Suite 170, Carlsbad, California 92008. It is registered as a foreign LLC in California with its registered agent in California listed as The Watkins Firm, A Professional Corporation, located at 9915 Mira Mesa Boulevard, Suite 130, San Diego, California, 92131.

26.     **Physical Rehabilitation Network Holdings, LLC** is a Delaware limited liability company. Its registered agent in Delaware is listed as The Corporation Trust Company, located at the Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

27.     **Idaho Rehabilitation Partners, LLC** is an Idaho limited liability company with a principal place of business located at 4275 Executive Square, No. 1020, La Jolla, California 92037. Its registered agent is Defendant Kevin Hulsey, founder and chief executive officer of RehabAuthority, located at 1560 South Carol Street, Meridian,

14

Idaho 83646, and its managing member is Defendant Physical Rehabilitation Network LLC.

28.     **RehabAuthority, LLC**, is an Idaho limited liability corporation with its principal place of business located at 1560 South Carol Street, Meridian, Idaho, 83646. Its registered agent is Defendant Kevin Hulsey located at 1560 South Carol Street, Meridian, Idaho, 83646. It is also registered as a foreign LLC in Minnesota.  Its registered agent in Minnesota is Kim Rosenthal at 511 Highway 59 South Suite A, Thief River Falls, Minnesota, 56701. It is also registered as a foreign LLC in North Dakota.  Its registered agent is Eldon Johnson at 775 Riverbend Road, Oxbow, North Dakota 58047. It is also registered as a foreign LLC in Wyoming with the above listed Idaho mailing address.

29.     **Premier Billing Solutions, LLC** is an Idaho limited liability company with a principal place of business located at 2965 East Tarpon Drive, Suite 150, Meridian, Idaho 83642. Its registered agent, Amy Roe, is listed as being at the same address.

### 2. Individual Clinic Entities

### a. Minnesota

30.     **RehabAuthority Moorhead LLC**, is a Minnesota limited liability corporation with its principal place of business located at 2505 8th Street South, Moorhead, Minnesota, 56560. Its registered agent is Capitol Lien Records & Research Inc., located at 1010 N Dale St., St. Paul, Minnesota 55117. With the Minnesota Secretary of State, it identifies its manager as Idaho Rehabilitation Partners LLC with a principal office at 5962 La Place Court Suite 170, Carlsbad, California, 92008.

31.     **RehabAuthority Thief River Falls LLC,** is a Minnesota limited liability corporation with its principal place of business located at 511 Highway 59 South Suite A, Thief River Falls, Minnesota, 56701. Its registered agent is Capitol Lien Records & Research Inc., located at 1010 N Dale Street, St. Paul, Minnesota 55117. With the Minnesota Secretary of State, it identifies its manager as Idaho Rehabilitation Partners LLC with a principal office at 5962 La Place Court Suite 170, Carlsbad, California, 92008. It is one of RehabAuthority's largest clinics.

### b. Idaho

32.     **RehabAuthority Caldwell LLC,** is an Idaho limited liability corporation with its principal place of business located at 120 E. Pine Street, Caldwell, Idaho, 83605. Its registered agent is Defendant Kevin Hulsey located at 1560 South Carol Street, Meridian, Idaho, 83646.

33.     **RehabAuthority Eagle LLC,** is an Idaho limited liability corporation with its principal place of business located at 5520 North Eagle Road No. 102, Boise, Idaho, 83713. Its registered agent is Defendant Kevin Hulsey located at 1560 South Carol Street, Meridian, Idaho, 83646.

34.     **RehabAuthority Homedale, LLC,** is an Idaho limited liability corporation with its principal place of business located at 134 East Idaho Avenue, Homedale, Idaho, 83628. Its registered agent is Defendant Kevin Hulsey located at 1560 South Carol Street, Meridian, Idaho, 83646.

35.     **RehabAuthority Kuna LLC,** is an Idaho limited liability corporation with its principal place of business located at 943 Linder Road, No. 104, Kuna, Idaho, 83634.

16

Its registered agent is Defendant Kevin Hulsey located at 1560 South Carol Street, Meridian, Idaho, 83646.

36.     **RehabAuthority Overland LLC,** is an Idaho limited liability corporation with its principal place of business located at 10790 West Overland Road, Boise, Idaho, 83709. Its registered agent is Defendant Kevin Hulsey located at 1560 South Carol Street, Meridian, Idaho, 83646.

37.     **RehabAuthority Nampa LLC,** is an Idaho limited liability corporation with its principal place of business located at 337 West Iowa Avenue, Nampa, Idaho, 83686. Its registered agent is Defendant Kevin Hulsey located at 1560 South Carol Street, Meridian, Idaho, 83646.

38.     **RehabAuthority Star, LLC,** is an Idaho limited liability corporation with its principal place of business located at 64 South Star Road Suite 2, Star, Idaho, 83669. Its registered agent is Defendant Kevin Hulsey located at 1560 S. Carol Street, Meridian, Idaho, 83646.

39.     **RehabAuthority Sunnyside LLC,** is an Idaho limited liability corporation with its principal place of business located at 3155 Channing Way Suite D, Idaho Falls, Idaho, 83401. Its registered agent is Defendant Kevin Hulsey located at 1560 South Carol Street, Meridian, Idaho, 83646.

40.     **RehabAuthority Woodruff LLC,** is an Idaho limited liability corporation with its principal place of business located at 720 South Woodruff Avenue, Idaho Falls, Idaho, 83401. Its registered agent is Defendant Kevin Hulsey located at 1560 South Carol Street, Meridian, Idaho, 83646, Meridian, Idaho, 83646.

17

### c. **North Dakota**

41.     **RehabAuthority Autumn Fields LLC,** is an Idaho limited liability corporation registered as a foreign LLC in North Dakota with a principal place of business located at 3170 43rd Street South, Suite 101, Fargo, North Dakota, 58104. Its principal office is identified as 5962 La Place Court, Suite 170 Carlsbad, California 92008. Its registered agent in North Dakota is Eldon Johnson, 1100 19th Avenue North, Suite K, Fargo, North Dakota 58102-2269. Its registered agent in Idaho is Defendant Kevin Hulsey located at 1560 South Carol Street, Meridian, Idaho, 83646.

42.     **RehabAuthority Demers LLC,** is an Idaho limited liability corporation registered as a foreign LLC in North Dakota. Its principal place of business in North Dakota is located at 701 Demers Avenue, Grand Forks, North Dakota, 58201. Its principal office is identified with the North Dakota Secretary of State is 5962 La Place Court, Suite 170, Carlsbad, California 92008. Its registered agent in North Dakota is Eldon Johnson 1100 19th Avenue North, Suite K, Fargo, North Dakota 58102-2269. Its registered agent in Idaho is Defendant Kevin Hulsey located at 1560 South Carol Street, Meridian, Idaho, 83646.

43.     **RehabAuthority University Town Center LLC,** is an Idaho limited liability corporation registered as a foreign LLC in North Dakota. Its principal place of business in North Dakota is located at 1100 19th Avenue North, Suite K, Fargo, North Dakota, 58102. Its principal office is identified with the North Dakota Secretary of State is 5962 La Place Court, Suite 170 Carlsbad, California 92008. Its registered agent in North Dakota is Eldon Johnson 1100 19th Ave North, Suite K, Fargo, North Dakota

58102-2269. Its registered agent in Idaho is Defendant Kevin Hulsey located at 1560 South Carol Street, Meridian, Idaho, 83646.

### d. Wyoming

44.     **RehabAuthority Cheyenne, LLC,** is a Wyoming limited liability corporation with its principal place of business located at 4515c East Pershing Boulevard, Cheyenne, Wyoming, 82001. Its registered agent is Unisearch, Inc., at 1107 West 6th Avenue, Suite B, Cheyenne, Wyoming 82001 with its principal office and mailing address at 5962 La Place Court, Suite 170, Carlsbad, California, 92008.

### D. Individual Defendants and Their Holding Companies

45.     **Defendant Kevin Hulsey** is a citizen of the United States of America and a resident of the City of Meridian, Canyon County, State of Idaho. Hulsey is the founder, manager, and Chief Executive Officer of Defendant RehabAuthority, LLC. He was and is knowingly involved in the design and implementation of the fraud schemes as described in detail herein.

46.     **Defendant H Corp.** is an Idaho corporation with a principal place of businesses located at 1560 South Carol Street, Meridian, Idaho 83646. Its incorporator, president, and registered agent, is Kevin Hulsey who is also located at 1560 South Carol Street, Meridian, Idaho 83646. Defendant H Corp is the second manager of RehabAuthority, LLC along with Defendant Kevin Hulsey.

47.     **Defendant Galen Danielson,** is a citizen of the United States of America and a resident of City of Meridian, Canyon County, State of Idaho. Danielson is the Chief

Operating Officer of RehabAuthority. He was and is knowingly involved in the design and implementation of the fraud schemes as described in detail herein.

48.     **Jiggsy, Inc.** is an Idaho corporation with a principal place of business located at 4125 North Rogue River Way, Meridian, Idaho 83646. Its incorporator, sole member of its Board of Directors, and registered agent is Galen Danielson who is located at 1560 South Carol Street, Meridian, Idaho 83646. Defendant Jiggsy Inc. is a member of RehabAuthority, LLC.

49.     **Defendant Adam Cope,** is a citizen of the United States of America and a resident of City of Meridian, Canyon County, State of Idaho. Cope is the Chief Human Resources Officer of RehabAuthority as well as the Vice President of Recruiting and University Relations for Physical Rehabilitation Network, LLC ("PRN") and was and is knowingly involved in the design and implementation of the fraud schemes as described in detail herein.

50.     **Chile, Inc.** is an Idaho corporation with a principal place of businesses located at 1814 West Milazzo Street, Meridian, Idaho 83646. Its incorporator, president, and registered agent is Adam M. Cope, who is also located at 1814 West Milazzo Street, Meridian, Idaho 83646. Defendant Chile, Inc. is a member of RehabAuthority, LLC.

51.     **Defendant Matthew Smith,** is a citizen of the United States of America and a resident of City of Wilder, Canyon County, State of Idaho. Smith is RehabAuthority's Chief Practice Officer and in March 2017 became the Chief Compliance Officer for Physical Rehabilitation Network, LLC ("PRN"), a position which, on information and belief, he holds in addition to his RehabAuthority position.

20

Smith was and is knowingly involved in the design and implementation of the fraud schemes as described in detail herein.

52.     **CrazyBeartooth, Inc.** is an Idaho corporation with a principal place of business located at 27607 Ustick Road, Wilder, Idaho 83676. Its incorporator, president, and registered agent is Matthew Smith, who is also located at 27607 Ustick Road, Wilder, Idaho 83676. Defendant CrazyBeartooth, Inc. is a member of RehabAuthority, LLC.

53.     **Defendant Nichole Walker,** is a citizen of the United States of America and a resident of City of Timnath, Larimer County, State of Colorado. Walker is Chief Administrative Officer of RehabAuthority and was and is knowingly involved in the design and implementation of the fraud schemes as described in detail herein.

54.     **Nikk Inc.** is an Idaho corporation with a principal place of business located at 5241 Rock Hill Street, Timnath, Colorado 80547. Its incorporator, president, and registered agent is Nichole Walker located at 1560 South Carol Street, Meridian, Idaho 83646. Defendant Nikk Inc. is a member of RehabAuthority, LLC.

55.     **Defendant Amy Roe** is a citizen of the United States of America and a resident of City of Meridian, Canyon County, State of Idaho. Roe is a founder, incorporator, the Chief Executive Officer of, and, since May 2007, the sole member of Defendant Premier Billing Solutions, LLC and was and is knowingly involved in the design and implementation of the fraud schemes as described in detail herein.

## VI.   APPLICABLE LEGAL AUTHORITY

### A. False Claims Act

56.     The False Claims Act ("FCA") was originally enacted during the Civil War.  Congress substantially amended the Act in 1986, 2009, and 2010, to enhance the ability of the Government to recover losses it sustained as a result of its payment of fraudulent claims.  After Congress found in 1986 that fraud in federal programs was pervasive and that the FCA is a primary tool for combating government fraud, Congress amended the Act with the intention of creating incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf to create a private/public partnership to obtain recovery for fraudulent claims submitted to the Government. *See generally, False Claims Act Amendments: Hearings Before the Subcomm. of Admin. Law and Gov't Relations of the Comm. on the Judiciary*, 99th Cong. 48 (1986)

57.     The FCA prohibits, *inter alia*: (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; and (c) failing to return known overpayments received from the government. 31 U.S.C. §§3729 *et seq.*  Any person who violates the FCA is liable for civil penalties for each violation, plus three (3) times the amount of the damages sustained by the United States.  31 U.S.C. §3729(a)(1). After a catch up inflation increase, the range of the civil penalties is adjusted for inflation by the

annual cost-of-living-adjustment. Federal Civil Penalties Inflation Adjustment Act

Improvements Act of 2015 (Section 701 of the Bipartisan Budget Act of 2015, Public

Law 114–74.) For civil penalties assessed after February 3, 2017, whose associated

violations occurred after November 2, 2015, the adjusted civil penalties are between

$10,957 and $21,916 per violation, while civil penalties assessed after August 1, 2016,

and on or before February 3, 2017, whose associated violations occurred after November

2, 2015, are between $10,781 and $21,563. 28 C.F.R. § 85.5.

**B. Minnesota False Claims Act**

58.     The Minnesota False Claims Act similarly imposes liability on any person

who knowingly presents, or causes or induces another person to present, a false claim to

the state for payment or approval. *See* Minn. Stat. §§ 15C.01 et seq.

59.     When a medical care provider willfully submits claims for reimbursement

knowing that such claims constitute false representations, resulting in the payment of

public funds for which the provider is ineligible, Minnesota law provides that the State is

entitled to recover treble damages plus a civil penalty of not less than $5,500 and not

more than $11,000$ per violation. Minn. Stat. § 15C.02(a).

**C. The Medicare and Medicaid Program and Payment of Claims for Outpatient Physical Therapy Services under Medicare Part B and Other Federal Healthcare Programs**

60.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, enacted

in 1965, established the Health Insurance for the Aged and Disabled Program, commonly

referred to as the Medicare Program. Pursuant to the Medicare program and other

government healthcare programs described below, the government pays claims for

23

certain medical services, including outpatient physical therapy services, for persons age 65 and older, and for persons with disabilities. 42 U.S.C. § 1395k(a)(2)(C).

61.    Medicare pays health care providers for the reasonable costs of providing covered health services to Medicare beneficiaries.  42 U.S.C. § 1395x(v)(1)(A).

62.    Critical to the continued solvency and viability of the Medicare and other Government health programs is that healthcare providers bill only for services that are actually performed.

63.    The United States Department of Health and Human Services ("HHS") is responsible for the administration and supervision of the Medicare program. The Center for Medicare and Medicaid Services ("CMS") is the division of HHS directly responsible for the administration of Medicare.

64.    Medicare Part A, which is not at issue here, provides hospital insurance benefits to the elderly and disabled. 42 U.S.C. § 1395c *et seq.*

65.    Medicare Part B is a federally subsidized, voluntary insurance program that pays a portion of the cost of certain medical and other health services not covered by the Part A program, including some physical therapy services. Payment for Medicare claims is made by the United States through CMS. In turn, CMS contracts with private insurance companies to receive, review, and pay appropriate claims for outpatient physical therapy services. 42 U.S.C. § 1395h and 42 U.S.C. § 1395u.

66.    The Federal Government administers other health care programs including, but not limited to, TRICARE/CHAMPUS, CHAMPVA, Medicaid and

federal workers' compensation programs, all of which have suffered fraud at the hands of the Defendants.

67.     TRICARE/CHAMPUS, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces. 10 U.S.C. §§ 1071 *et seq.*; 32 C.F.R. § 199.4(a).

68.     CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100 percent service-connected disability.  38 U.S.C. §§ 1781 *et seq.*; 38 C.F.R. § 17.270(a).

69.     The Medicaid Program ("Medicaid"), administered by individual states and jointly funded by State and Federal taxpayer revenue, is a health insurance program also created as part of the Social Security Act, 42 U.S.C. §§ 1396-1396v. The federal portion of a state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on a state's *per capita* income compared to the national average. 42 U.S.C. § 1396d(b). In Minnesota, the FMAP constitutes 50% of Medicaid expenditures. The Medicaid program in Minnesota is called "Medical Assistance." Minn. Stat. § 256B.01

70.     The Federal Employees' Compensation Act provides workers' compensation coverage, including coverage of medical care received as a result of a workplace injury, to federal and postal employees.  The Act is administered by the Department of Labor, Division of Federal Employees' Compensation.  5 U.S.C. §§ 8101 et seq.; 20 C.F.R. §§ 10.0 *et seq.*

1. **Medicare and Medicaid Enrollment Process, Participation Requirements, and Provider Agreements.**

71.     To participate in the Medicare program, a healthcare provider must enter into a contract with CMS in which the provider agrees to conform to all applicable statutory and regulatory provisions relating to Medicare payments and reimbursements. 42 U.S.C. § 1395cc. For example, healthcare providers participating in the Medicare program must:

> (a) Refrain from making false statements or misrepresentations of material facts concerning payment requests;
>
> (b) Not bill for any services or products that were not performed or delivered in accordance with all applicable policies;
>
> (c) Be fully licensed and/or certified under all applicable state and federal laws to perform the services provided to the recipients;
>
> (d) Comply with the applicable state and federal statutes, policies and regulations; and
>
> (e) Not engage in any illegal activities related to the furnishing of services or products to recipients.

42 U.S.C. § 1395, *et seq.*

72.     To contract with Medicare, providers must compete a Medicare Enrollment Application form. "Institutional Providers," such as hospitals, nursing homes, and hospices enroll in Medicare Part A using form CMS 855A. Outpatient "Clinics/ Group Practices," involved here, however, enroll in Part B using CMS application form 855B while individual providers enroll in Part B using CMS 855I.

26

73.    Each enrollment application form includes as a condition of participation in the Medicare Part B program that providers be familiar with and abide by the program's reimbursement policies and make the following Certification Statement:

> (3) *I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. . . . I understand that payment of a claim by Medicare is condition upon the claim and the underlying transaction complying with such laws, regulations and program instructions . . . and on the suppliers' compliance with all applicable conditions of participation in Medicare.*
>
> ...
>
> (6) *I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.*

74.    Accordingly, **RehabAuthority** had and has a duty to know the statute, regulations, and guidelines regarding coverage for Medicare services.

75.    Finally, in addition to their enrollment obligations, Medicare Part B providers must annually execute the Medicare Participating Physician or Supplier Agreement (CMS – 460):

> *The above named person or organization, called "the participant," hereby enters into an agreement with the Medicare program to accept assignment of the Medicare Part B payment for all services for which the participant is eligible to accept assignment under the Medicare law and regulations and which are furnished while this agreement is in effect....*

76.    The Agreement further notes that substantial failure to "comply with the agreement" will cause the Agreement to be terminated and may result in "[c]ivil and criminal penalties."

77.   Likewise, in order to participate in and receive reimbursement from the
Minnesota Medical Assistance Medicaid program(s), providers must certify compliance
with state laws and regulations by initialing each page of and signing a Provider
Agreement.

78.   By executing the **Provider Agreement**, the provider certifies that he/she/it
will (a) comply with all federal and state statutes and rules relating to the delivery of
services to individuals and to the submission of claims for such services; (b) assume full
responsibility for the accuracy of claims submitted to DHS in accordance with the
certification requirements of 42 C.F.R. 455.18 and Minnesota Statutes 256B.27, Subd. 2.;
(c) ensure that the provider's employees and contractors comply with all Minnesota
Health Care Programs (MHCP) requirements; (d) maintain records that fully disclose the
extent of services provided to MHCP recipients for a period of five years after the initial
date of billing DHS; (e) ensure proper handling and safeguarding by provider employees,
contractors, and authorized agents of protected information collected, created, used,
maintained, or disclosed on behalf of DHS; (f) determine the applicability to the provider
of any other state or federal laws and ensure compliance with those laws; and (g) refund
any overpayment made to the provider by DHS.  MHCP Provider Agreement, *available
at https://edocs.dhs.state.mn.us/lfserver/Public/DHS-4138-ENG.*

79.   At all times relevant to this action, **Defendant RehabAuthority** was a
participating Medicare and Minnesota Medical Assistance provider.

28

## 2. **Medicare Submission of Certified Claims for Payment**

80.     To bill Medicare Part B, a provider must submit a paper form or its electronic equivalent form to its regional Medicare Administrative Contractor ("MAC"). A MAC is a private health care insurer that has been awarded a geographic jurisdiction to process Medicare claims. Generally, pursuant to rules promulgated under the 2001 Administrative Simplification Act, claims must be submitted electronically unless certain exceptions are met, in accordance with CSM, Medicare Claims Processing Manual, ch. 1, § 02. Exceptions allowing for submission of paper claim forms include small providers, defined as those with fewer than ten (10) full-time employees or providers that submit fewer than ten (10) Medicare claims per month.

81.     The type of claim form required to be submitted depends on the type of provider submitting the claim. Generally, institutional providers submit 837I, or its paper equivalent, CMS 1450, also known as UB-04, while claims for the services of individual health care professionals are submitted using 837P, or its paper equivalent CMS 1500, formerly known as HCFA 1500.  These forms describe, among other things, the provider, the patient, the referring physician, the service(s) provided by procedure code, the related diagnosis code(s), the dates of service, and the amount charged.

82.     Providers submitting 837I or CMS 1450 certify that the information provided is "true, accurate and complete" and that the specific services billed on the form are "medically indicated and necessary" for the specific patient beneficiary involved. Likewise, providers submitting 837P or CMS 1500 certify that "[s]submission of this

claim constitutes certification that the billing information as shown on the face hereof is true, accurate, and complete."

83.　　At all times relevant to this action, **Defendant RehabAuthority** and its employees were participating Medicare providers, and the local carriers that reviewed and approved the claims at issue in this case based their approval on their review of the enrollment and claim information provided by RehabAuthority and they relied on the veracity of those claims submissions.

84.　　RehabAuthority's employees who are participating Medicare providers include physical therapist ("PTs") and physical therapist assistants ("PTAs").

### 3. Specific Minnesota and Federal Payment Requirements

85.　　Medicare only pays for "covered services," 42 C.F.R. § 424.5(a), and providers must ensure that patient services "will be of a quality which meets professionally recognized standards of health care." 42 U.S.C. §1320c-5(a)(2).

86.　　Medicare Part B pays for physical and occupational therapy services when the services are rendered by a qualified physical therapist (PT) or by an appropriately supervised physical therapist assistant (PTA). *See* 42 C.F.R. §§ 410.60.

87.　　A physical therapist or physical therapist assistant is "qualified" only if they are "legally authorized (if applicable, licensed, certified, or registered) to engage in the private practice of physical [or occupational] therapy by the State in which he or she practices, and practice only within the scope of his or her license, certification, or registration." 42 C.F.R. §§ 410.60.

88.     Generally, a physical therapy assistant performs services planned, delegated, and supervised by the supervising physical therapist, assists in preparing clinical notes and progress reports, and participates in educating the patient. 42 C.F.R. § 484.32. A physical therapy assistant generally holds only a Master's Degree while physical therapists obtain a Doctorate of Physical Therapy.

89.     In the limited circumstance when a physical therapy assistant is *directly supervised* by a licensed physical therapist, such physical therapy assistant is, for that instance, qualified to provide many if not most of the same services as a licensed physical therapist, with the important exception of the initial evaluation and diagnosis of patients.

90.     Services provided by physical therapy assistants or non-licensed support staff may only be fully paid by Medicare as services provided "incident to the service of a physician (or other practitioner)." 42. C.F.R. § 410.26(b). Accordingly, "only the supervising [therapist] may bill Medicare for incident to services." § 410.26(b)(5).

91.     Under 42 C.F.R. § 410.32(b)(3)(ii), for purposes of Medicare reimbursement:

> Direct supervision in the [outpatient therapy] office setting means the [therapist] must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed.

92.     Unlike supervised physical therapy assistants, whose therapy services are payable by Government healthcare programs at the same rate as physical therapists and the occupational therapists, unlicensed "supportive personnel," variously called

"technicians" or "trainers," are allowed to "assist" providers by "performing services incident to physical therapy that do not require professional knowledge and skill," such as setting up equipment. 42. C.F.R. § 485.713(c). Their services are not payable by Government health programs, because they are not state-licensed providers of therapy services. Accordingly, their services do not meet Medicare's definition of reimbursable "auxiliary personnel" incident-to services. 42. C.F.R. § 410.26(a)(1).

93.    Minnesota's Medical Assistance Medicaid program likewise only covers medically necessary physical therapy services that are provided by physical therapists or by physical therapy assistants who are directly supervised by licensed physical therapists. Minn. Stat. § 256B.0625 subd. 8.

94.    Minnesota law similarly distinguishes a licensed physical therapy assistant from unlicensed support staff, referred to therein as a "physical therapy aide" who, when directly supervised, may only "perform tasks related to preparation of patient and equipment for treatment, housekeeping, transportation, clerical duties, departmental maintenance, and selected treatment procedures." Minn. Stat. § 148.706 subd. 4.

95.    However, Minnesota's "direct supervision" requirement for physical therapy assistant services is less strict than Medicare's, as the supervising physical therapist is "not required to be on site, but must be easily available by telecommunications" and is only required to "provide on-site observation of the treatment and documentation of its appropriateness at least every six treatment sessions." Minn. Stat. § 148.706 subd. 3. A PTA providing delegated services "under the direction of a

physical therapist who is not on the premises shall be reimbursed at 65 percent of the physical therapist rate."

### 4. Outpatient Therapy Billing and Coding Rules and Regulations

96.     Outpatient therapy providers bill for their services using the Current Procedural Terminology ("CPT") coding system adopted in 1983 by CMS as part of the Healthcare Common Procedure Coding System ("HCPCS"). These codes are a systematic listing of procedures and services performed by healthcare providers and are used to describe and evaluate the services claimed for reimbursement based generally on the time and complexity of the service.

97.     Billing rules for outpatient therapy services are unique in that the Medicare Claims Processing Manual distinguishes between **"time-based" procedures** and **"service-based" procedures**. CMS, *Medicare Claims Processing Manual*, ch. 5 *et seq.*

98.     **Service-based procedures** include evaluations and certain "unattended" "modalities," such as the application of hot packs or electrical stimulation, and are limited to one billable unit regardless of total minutes. CMS, *Medicare Claims Processing Manual*, ch. 5 *et seq.*

99.     **Timed procedures** include "constant attendance" codes, including some of the most common therapy services such as therapeutic exercises, CPT 97110; therapeutic activities, CPT 97530; manual therapy, CPT 97140; gait training, CPT 97116; and ultrasound, CPT 97035.

100.     One-on-one timed therapeutic procedures and services are billed in fifteen-minute units. Each fifteen-minute one-on-one contact between the physical therapist and

the patient constitutes one (1) single unit for Medicare billing and payment purposes. Thus, one unit of CPT code 97110 is properly charged and billed to Medicare programs for 15 minutes of direct one-on-one contact, two units is proper for 30 minutes of one-on-one contact, and so forth. CMS, *Medicare Claims Processing Manual*, ch. 5 *et seq.*

101.   Described in further detail below, face-to-face therapy minutes are added up and divided by fifteen (15) to determine the total **billable units** for a given procedure code, with an additional unit granted where at least eight(8) minutes of a given therapy is provided, pursuant to the "8-minute rule." CMS, *Medicare Claims Processing Manual*, ch. 5 *et seq.*

102.   Accordingly, Medicare does not pay for physical therapy services performed by unqualified providers or unlicensed personnel; for work performed by physical therapist assistants independent of the supervision of a licensed physical therapist; or, most critically in the instant case, for one-on-one therapy services that either are not actually provided one-on-one, or are not actually provided at all.

103.   By virtue of their participation in the Medicare program, Defendants are charged with the knowledge of these billing codes and requirements.

104.   At all times relevant to this complaint, Defendants were aware of the above listed statutory and regulatory requirements for claims submitted to Medicare for payment of physical therapy services.

105.   Healthcare providers, including physical therapists, are paid under Medicare *only if* the healthcare provider assures that:

a. No claim for an item or service is based upon a code that will provide greater payment than the code which is applicable to the item or service actually provided and;

b. Claims submitted for reimbursement do not make false statements or misrepresentations of material facts.

106. Accordingly, **RehabAuthority** had a duty to know the statute, regulations and guidelines regarding coverage for Medicare services.

107. Generally, and by the express terms of the Medicare enrollment application's Certification Statement, the above payment conditions likewise apply to claims presented to the Medicaid and TRICARE programs and all other Government healthcare programs involved herein.

## VII.   FACTUAL BACKGROUND

### A. Relator Cami Lane

108. **Defendant RehabAuthority, LLC** hired **Relator Cami Lane** in January 2010 as the Front Office Coordinator in its Homedale, Idaho clinic.

109. Initially, Relator's function was limited to reception and clerical duties, including greeting patients upon arrival, recording patient contact information, answering phone calls, working with patients to schedule appointments, entering billable charges into RehabAuthority's MedBill software system ("MBS"), and similar duties.

110. Approximately one year into her employment with **RehabAuthority**, Relator's duties in 2012 grew to include receiving payments from clients, verifying patients' insurance, submitting requests for required insurance authorizations, and conducting weekly "data checks" by manually completing comprehensive reviews of

35

patient accounts to ensure that all information relevant to billing was complete, including

patient name and contact information, required signatures, insurance provider identity

and authorization information, and billing codes, prior to being sent to **Defendant**

**Premier Billing Solutions** for processing and submission to the Government for

payment.

111. As **RehabAuthority**'s Homedale, Idaho clinic's Front Office Coordinator,

Relator reported directly to **Defendant Matthew Smith** ("Smith"), a licensed Physical

Therapist, who was then the head Physical Therapist at Homedale.

112. As **RehabAuthority-Homedale**'s head Physical Therapist, **Smith**

frequently repeated to Relator that patient scheduling must be "perfect," in that patients

had to be scheduled "on the hour," in order to maximize efficiency.

113. On particularly busy days, **Smith** instructed Relator as to

**RehabAuthority**'s policy and practice to "remove" or "hide" the patient sign-in sheet

located at the front desk so that **Smith**, himself, could write in falsified times. Based upon

Relator's experience with RehabAuthority and on documents she has reviewed, she

believes that Smith's instruction to her to remove the patient sign-in sheets to allow the

entry of falsified times was repeated by other head therapists throughout **Defendant**

**RehabAuthority's** network of clinics.

114. Such practice enabled **Defendant RehabAuthority** to, at times, at least

partially conceal the double or even triple-booking of patient beneficiaries while billing

the Government health programs as if individual one-on-one therapy had actually been

provided.

115.    Double-booking patients was the only way to maintain the euphemistic "efficiency" **Smith** demanded, and although he ostensibly indicated at times that he preferred patients not be double-booked, he ultimately praised Relator's scheduling work when she did so.

116.    From then on, Relator became the "go-to" Front Office Coordinator for **Smith** and other upper-level **RehabAuthority** management, such as **Defendant Chief Administrative Officer Nichole Walker**. Relator's duties and access were then significantly widened to include working with a computer programmer to build and launch the company's internal scheduling and MBS patient account software, which was a platform developed by Defendant Premier Billing solutions and then implemented and customized for RehabAuthority with Relator's general assistance.

117.    In September 2012, Relator sought and obtained permission from RehabAuthority's Chief Administrative Officer Nicole Walker to work part-time from home for about 30 hours weekly. Her duties were then limited to the above-described "data checks," which Relator performed remotely for each of RehabAuthority's clinics in addition to providing regular assistance to other clinics' Front Office Coordinators. To perform her duties, Relator had complete round-the-clock access to Defendant RehabAuthority's computer network, including patient records.

118.    Between 2012 and 2016, Relator started to become generally familiar with the Medicare and Medicaid billing rules through her scheduling and "data check" responsibilities. She understood at that time that double-booking technically *is not* prohibited *per se* and that therapy services are billed in timed and untimed units, with 8-

37

15 minutes of one-on-one therapy time constituting the former. CMS, *11 Part B Billing Scenarios for PTs and OTs,* (Sept. 2009), *available at* https://www.cms.gov/Medicare/Billing/TherapyServices/downloads/11_Part_B_Billing_ Scenarios_for_PTs_and_OTs.pdf.

119.    In late November 2016, **RehabAuthority** assigned Relator to a project that ultimately raised her suspicions of potential Medicare fraud.

120.    **RehabAuthority's** Chief Financial Officer Stacey James instructed Relator in late November 2016 via email to help **RehabAuthority** and **Premier Billing Services** "clean house" by using her "super sleuth skills" to manually identify overpayments received from insurers, including Medicare and Medicaid, so that **Premier Billing Service's** Chief Executive Officer, **Defendant Amy Roe**, could "remove" them from RehabAuthority's billing records.  This directive was made for the purpose of *concealing* the overpayments from Government auditors and thereby evade their repayment obligations.

121.    Relator completed the removal project described above in February 2017.

122.    In June 2017, Relator was informed by RehabAuthority's Chief Administrative Officer, **Defendant Nicole Walker,** that Relator's position was being eliminated because "data checks" would no longer be needed once an Electronic Medical Records "(EMR")" system was implemented in the summer of 2017.

123.    At the same time in June 2017, **Defendant Nicole Walker** encouraged Relator to review the MedBill software system and "think about what kind of other roles" Relator might be able to fill. Thinking that she may be a fit for a compliance-related role,

Relator, who had recently completed a brief certification/continuing education seminar on Medicare billing rules for physical therapy, began reviewing RehabAuthority's billing software and records for areas with potential compliance challenges where the skills she developed as a "data checker" might be put to use even after the transition to EMR.

124.    During this review, Relator discovered proof of what she came to understand is a systemic, large-scale healthcare fraud scheme against the taxpayers of the United States and the State of Minnesota.

**B. Defendants' Organizational Structure**

125.    Founded in 1999 by current Chief Executive Officer, **Defendant Kevin Hulsey** as a single clinic in Nampa, Idaho, **RehabAuthority** has expanded rapidly in the last seventeen (17) years and now employs over 100 employees, including over thirty (30) licensed Physical Therapists, five (5) Physical Therapy Assistants, and over fifty (50) support and administrative staff with eighteen (18) locations in four (4) states: Idaho, eleven (11) clinics; North Dakota, four (4) clinics; Minnesota, two (2) clinics; and Wyoming, one (1) clinic.

126.    Defendant RehabAuthority's corporate office is located in Meridian, Idaho, a suburb of Boise, Idaho.

127.    Today, **Defendant RehabAuthority** exists as an amalgamation of at least sixteen (16) limited liability companies.  Originally incorporated by **Defendant Kevin Hulsey** in April 1999 as RehabAuthority, PLLC, the company had just the single clinic headquartered at the Nampa, Idaho location.

128.    **Defendant RehabAuthority** began its corporate reorganization in 2001, when Hulsey opened new clinics in Homedale, Idaho and in Boise, Idaho.

129.    In 2002, **Defendant Kevin Hulsey** dissolved RehabAuthority PLLC; separately incorporated his two new clinics as RehabAuthority - Eagle Road, PLLC, now Defendant RehabAuthority Eagle, LLC, and Defendant RehabAuthority Homedale, LLC, respectively.  He also re-incorporated his primary Nampa, Idaho location as RehabAuthority Nampa, LLC; and incorporated a holding company, **Defendant H. Corp.,** as a member of these three (3) individual limited liability corporations.

130.    **Defendant Hulsey** has continued this pattern of incorporation, separately incorporating a new limited liability company for each new RehabAuthority clinic location, including eight (8) new Idaho clinics from 2002 to 2017; four (4) North Dakota clinics from 2011 to 2017; two (2) Minnesota clinics in 2014; and a Wyoming clinic in 2017.

131.    RehabAuthority's rapid growth, set forth above, has been built, at least in part, on the backs of the taxpayers through fraudulent billing to Government healthcare programs.

132.    Despite the façade of different corporate entities, RehabAuthority functions as a single corporate entity.

133.    Each clinic is thinly staffed, commonly owned, and operated under the same set of **RehabAuthority** policies and practices. Additionally, while the providers at each clinic are delegated some management authority over the day-to-day clinic

operations and support staff, all clinics and all employees ultimately report and are subject to the decisions made by **RehabAuthority's** central corporate management.

134. **RehabAuthority** corporate is organized with three (3) regional managers who in turn report to **Defendant Kevin Hulsey** and four (4) corporate officers: Chief Operating Officer, **Defendant Galen Danielson**, and his sister, Chief Administrative Officer, **Defendant Nichole "Nikki" Walker**, a licensed Physical Therapist; Chief Human Resources Officer, **Defendant Adam Cope**, a licensed Physical Therapist; and Chief Practice Officer, **Defendant Matthew Smith**, a licensed Physical Therapist, who is also the Regional Director for "Region 1," which includes seven (7) eastern Idaho clinics.

135. **Defendant Adam Cope** is the Region 2 Director, which includes the two Idaho Falls and the Meridian, Idaho clinics. Eldon Johnson, is the Region 3 director, which includes the four (4) North Dakota clinics, the two Minnesota Clinics, and the Cheyenne, Wyoming clinic.

136. Except for one, all of the RehabAuthority Regional Directors are also RehabAuthority corporate officers based primarily out of RehabAuthority's "corporate office," on South Carol Street in Meridian, Idaho, which is not an active treating clinic. The exception is Eldon Johnson, who is listed on RehabAuthority's directory as a Physical Therapist practicing out of the Autumn Fields clinic in Fargo, North Dakota, and he is self-identified online as an "owner" of that clinic.

137. According to Idaho Secretary of State business entity records, **Defendant Galen Danielson** became a member of **RehabAuthority, LLC** in 2003; **Defendant**

**Cope** joined in 2004-2005; and **Defendants Walker and Smith** joined in 2007 through their respective holding companies, **Defendants Nikk Inc. and Crazy Bear Tooth Inc.**

138.   In 2007, **Defendant Hulsey**, at all times the managing member of **RehabAuthority, LLC**, moved the company headquarters out of the Nampa, Idaho clinic to offices in Meridian, Idaho, ultimately settling in 2013 on their current headquarters on South Carol Street. Also in 2013, Hulsey incorporated **Defendant Idaho Rehabilitation Partners, LLC**, with California-based **Defendant Physical Rehabilitation Network, LLC** as its managing member. In February 2014, **Defendant Idaho Rehabilitation Partners, LLC**, a privately held therapy organization that provides streamlined "overhead activities" through its "partnership model," became the managing member of each individual location-specific clinic LLC.

139.   This ownership structure allows the principal owners and executives of RehabAuthority, namely Hulsey, Danielson, Cope, Smith, and Walker, to exercise complete control over RehabAuthority's management, operations, and finances through RehabAuthority, LLC while incentivizing physical therapists, such as Defendant executive Mathew Smith early in his tenure with the company and current Regional Director Eldon Johnson, to maximize their clinics' revenue by offering the profit sharing that comes with ownership in the individual LLCs and/or partnership in RehabAuthority, LLC.

140.   Nonetheless, the primary corporate entity is RehabAuthority LLC, which collects the revenue from the individual clinics, maintains the corporate office, and, until 2015, paid the employees of the individual clinics. Since 2015, RehabAuthority's payroll

has been outsourced to Amlease Corp., a Florida-based contractor for Physical Rehabilitation Network, LLC.

141.    As of June 2017, RehabAuthority LLC employs at least 88 people across 17-18 clinics, including about thirty-one (31) physical therapists, thirty-two (32) rehabilitation technicians, five (5) physical therapy assistants, and nineteen (19) Front Office Coordinators.

142.    With the exception of its two (2) largest clinics, Sunnyside Clinic in Idaho Falls and Thief River Falls, Minnesota which respectively have four (4) and five (5) therapists on staff, **RehabAuthority** keeps payroll down and profits high by staffing their clinics as leanly as possible.  Seven (7) of the clinics have just one (1) physical therapist and eight (8) clinics have only two (2) physical therapists.

143.    **RehabAuthority** employees are interchangeable / transferrable within their geographic regions, and physical therapists occasionally treat patients at other **RehabAuthority** clinics in addition to their regularly assigned clinics.

144.    **RehabAuthority** corporate officers, particularly Regional Director and Chief Practice Officer, **Defendant Matthew Smith**, often treat patients at several clinics, including the newer clinics in Minnesota, in order to "show" their subordinate Physical Therapists how to treat patients "efficiently," thereby training them to commit fraud by double or triple booking patient beneficiaries while billing for services as if each patient beneficiary were seen individually.

145.    After negotiations beginning no later than 2013, **Defendant Idaho Rehabilitation Partners, LLC, the parent company for RehabAuthority, LLC was**

43

acquired by Carlsbad, California-based **Defendant Physical Rehabilitation Network, LLC,** an outpatient physical therapy organization that provides overhead support—such as payroll, accounting branding, human resources, and electronic medical records—while allowing local autonomy to affiliated outpatient physical therapy providers in California, Colorado, Nevada, Texas, and Washington.

146.    Bruce McDaniel is the Chief Executive Officer of **Defendant Physical Rehabilitation Network, LLC.**

147.    **Although Physical Rehabilitation Network, LLC** purchased a significant interest in its parent company, **RehabAuthority, LLC** continues to do business under its own name and management. **Defendant Kevin Hulsey** remains CEO of RehabAuthority. RehabAuthority's President of Practice, Education & Research, **Defendant Matthew Smith,** and Chief Human Resource Officer, **Defendant Adam Cope,** in addition to their day-to-day RehabAuthority duties, have been respectively elevated to **Defendant Physical Rehabilitation Network, LLC's** Chief Compliance Officer and Lead Recruiter.

### C. Defendants' Operational Structure

148.    **Defendant Galen Danielson** serves as Chief Operating Officer of **Defendant RehabAuthority, LLC.** In this capacity he, along with Public Relations Director Eric Stone, drives **RehabAuthority's** focus on patient-visit maximization through aggressive relationship-based, word-of-mouth, marketing activities and employee incentive compensation programs. As of August 2017, Danielson also serves as

44

Physical Rehabilitation Network's Regional Vice President of Operations for the Mountain Region, which includes Idaho, Minnesota, North Dakota, Wyoming, and Utah.

149.    **RehabAuthority** keeps close track of the number of referrals and overall patient beneficiary visits each physical therapist at each clinic generates. The number of referrals and visits in turn directly impacts provider compensation. Since each clinic is separately incorporated as a limited liability company, **Defendants Danielson and Hulsey** offer equity and profit-sharing to physical therapists for the clinics in which they work when specified revenue and patient visit benchmarks are met.

150.    In addition to direct financial incentives, **Defendants CEO Hulsey and COO Danielson** design "games" designed to further incentivize revenue generation through employee competition, granting physical therapists and clinics "points" for " Relationship Development Activities," such as "handshakes" with "MD's, DO's, NP's [and] PA's" and social media marketing; "Clinic Performance (Referral Increases, Visits)"; and "Breaking Records."

151.    The physical therapists, employees and clinics with the most "points" in those categories receive cash prizes. For example, the providers with the most "points" from October 31, 2016 to January 27, 2017 received a $1,000 cash payment, followed by $750 for the highest scoring Front Office Coordinators ("FOCs") and $500 for the highest scoring technicians.

152.    RehabAuthority financial contests include no measure or points for quality of patient care.

153.    In contrast to its well-developed marketing and incentive programs, **RehabAuthority's** case management and medical record systems are rudimentary and poorly monitored, as all providers' billing records are initially hand-written on paper and then manually entered into its software system by the Front Office Coordinators, whose attention to detail and/or willingness to participate in the fraud is RehabAuthority's sole internal "compliance" mechanism.

154.    Providers at **RehabAuthority** create two (2) types of records for each complete patient visit: a "flow sheet" and a "visit note," also known as a "SOAP" note, meaning a subjective, objective, assessment, and plan note.

155.    The **flow sheet** constitutes the billing record for five (5) patient beneficiary visits per sheet. At the top of the flow sheet is the patient's name, insurance provider, initials of the provider of record, and a general description of the part of the anatomy and ailment treated.

156.    The flow sheet also contains a simple chart, with columns labeled at the top according to the dates of services and rows labeled on the right-hand side with the various therapeutic exercises and activities available. The provider then handwrites in the corresponding box at the bottom of column for each visit, the number of minutes a given therapy was provided on the given day to the patient beneficiary. The entries are generally entered in ink, with errors scratched out, fixed, and initialed. Also in the bottom box, the provider records any manual therapy or modalities provided before calculating and circling the total number of units to be billed, initialing the "Time-In" and "Time-Out."

157.    In contrast, the visit note constitutes the medical record, or chart notes, generated during a patient beneficiary visit and is referred to as a **"SOAP"** note because it is organized into notes on the subjective and objective observations of the patient's complaints, condition, symptoms, and progress, along with the physical therapist's assessment and plan.

158.    A patient beneficiary's SOAP note is typed, with a pre-populated signature block indicating the name of the beneficiary's physical therapist of record, i.e. the therapist to whom the patient was referred and/or assigned. If the patient is seen by a physical therapy assistant under the supervision of the licensed physical therapist of record, the assistant initials the SOAP note for that visit above the therapist's name. Each SOAP note is password-protected, and only the therapist of record knows the password.

159.    Every morning, either a Front Office Coordinator ("FOC") or a Technician prepares a blank flow sheet for each patient scheduled to be seen on that day. As each patient beneficiary arrives, the FOC fills in the basic identifying information about the patient beneficiary and gives the flow sheet to the provider. Upon completion of the visit, (and occasionally during the visit) the provider fills out the flow sheet according to the number of minutes of each type of therapy, totals the minutes, writes the number of units, and returns the flow sheet to the FOC. The FOC then accesses each patient beneficiary's electronic MBS account, selects "add charge," and manually enters each billable therapy unit, transcribing directly from the providers' flow sheets, into **RehabAuthority's** overall corporate billing and case management system, MedBill Solutions ("MBS") software.

47

160.    Then, every Wednesday morning, **Defendant Premier Billing Solutions**, a local Boise-area medical billing company founded and managed by its Chief Executive Officer, **Defendant Amy Roe**, uses its simultaneous access to MBS to process the units entered by FOCs and submit them as claims for payment. This final step is completed using the "Admin" function of the MBS system, to which **Defendant Premier**, and not FOC's, has access, and which allows Defendant Premier Billing Solutions to process claims and handle denials and other reimbursement issues,

161.    The MedBill Solutions software system was designed specifically for **Defendant RehabAuthority** with assistance from **Defendant Premier Billing Systems**, a contracted computer programmer, and **Relator Cami Lane**.

162.    Front Office Coordinators enter patient beneficiary information into the MedBill Solutions system which then assigns a unique "account code" for each beneficiary. Within each patient beneficiary account is a left-hand menu of tabs which, when clicked, take the Front Office Coordinators to labeled subfolders including: "Personal Data," "Marketing," "Responsible Party," "Diagnosis," "Insurance," "Financial," "Financial Statistics," "Notes," "Evals," SOAPs," "Plan of Care Requests," "Patient Responsibility Calculator," "Review Payments," "Statements," and "Clone Patient."

163.    Each patient beneficiary's "Financial Statistics" MBS subfolder contains a record of each date of service, the CPT codes with a description of the therapy provided, any modifiers, and the amounts paid and/or owed by the beneficiary and/or Medicare or other Government healthcare plan. When a particular date of service is selected, a box

pops up on the right-hand side of the screen, identifying the units billed and the healthcare plan.

164.    All of the data in the Financial Statistics subfolder is manually entered by Front Office Coordinators directly from the handwritten **flow sheets**. The data is then compiled in MBS and electronically forwarded to **Defendant Premier Billing Solutions** for preparation and submission of claims for payment by Government healthcare programs.

165.    **Defendant RehabAuthority** has no in-house billing department, coding experts, compliance officers, or other billing professionals to act as intermediaries with **Defendant Premier Billing Solutions.** Instead, **Defendant RehabAuthority** relies solely on its Front Office Coordinators who receive billing directives from CAO Nikki Walker and CFO Stacey James and directly from **Defendant Premier Billing Solutions'** CEO Amy Roe.

166.    According to its website, **Defendant Premier Billing Solutions** charges five (5) to eight (8) per cent of total payments received through its services and boasts that it has "one of the highest collection rates in the Treasure Valley [Idaho]."

167.    Defendant RehabAuthority is one of **Defendant Premier Billing Solution'** largest and most lucrative clients by a large margin.

## VIII.   DEFENDANTS' FRAUDULENT CONDUCT

### A.  Introduction to Defendant RehabAuthority's Multiple Fraud Schemes

168.    As introduced above, **RehabAuthority's** rapid expansion has been fueled by its focus on fraudulent billings to obtain payments from the Government for services

that were not rendered as documented. **Defendant RehabAuthority's** overbilling fraud scheme is built on double and triple booking Government beneficiaries and fraudulently documenting more billable units than could have possibly been provided to each beneficiary individually.

169.   As described in detail above, the Medicare billing rules simply require that therapy **only be billed as one-on-one if actually provided as such** and reflects the fact that, just as there are only so many hours in a day, a physical therapist can only truthfully bill a finite number of 15-minute units per therapy visit.

170.   To facilitate its primary fraud scheme of double and triple booking beneficiaries' physical therapy sessions, **Defendant RehabAuthority** augments and compounds its fraudulent scheme by enlisting non-licensed personnel to attempt to provide physical therapy services.

171.   **Defendant RehabAuthority** requires its non-licensed personnel, primarily the rehabilitation technicians, but also at times even the Front Office Coordinators, to provide both timed and untimed services while the physical therapists are occupied with other patient beneficiaries. And, to fraudulently bilk the government, **Defendant RehabAuthority** then bills the non-licensed individuals' "services" as if the physical therapy had actually been performed by a physical therapist or physical therapy assistant under a physical therapists' direct supervision.

172.   **Defendant RehabAuthority** also engages in additional fraudulent schemes including 1) the waiver of copayments and deductibles as a kickback to attract patients,

2) unbundling of paired CPT codes without supporting documentation, and 3) the

knowing and planned retention of Government overpayments.

### B. RehabAuthority's Overbilling Scheme: Submitting Claims for One-on-One Therapy Units Not Actually Provided

#### 1. General Description

173.   Medicare's outpatient therapy billing requirements are designed to ensure

that the Government is getting what it pays for pursuant to its contracts and the

certifications it requires for payment. Accordingly, "the total number of timed 15-minute

units that can be billed by the physical therapist, whether performed by the therapist or

licensed physical therapy assistant for each patient is constrained by the total time of the

skilled therapeutic one-on-one intervention by the therapist or therapy assistant." CMS,

*11 Part B Billing Scenarios for PTs and OTs,* (Sept. 2009, *available at*

https://www.cms.gov/Medicare/Billing/TherapyServices/downloads/11_Part_B_Billing_

Scenarios_for_PTs_and_OTs.pdf.

174.   Nonetheless, Medicare provides for some flexibility in the calculation of

"direct contact" units, meaning the "one-on-one," "constant attendance" billable therapy

units for time-based services, through what is commonly referred to as the "eight-minute

rule," which is illustrated in the following chart:

| 8 - 22 minutes | 1 unit |
|---|---|
| 23 - 37 minutes | 2 units |
| 38 - 52 minutes | 3 units |
| 53 - 67 minutes | 4 units |
| 68 - 82 minutes | 5 units |
| 83-97 minutes | 6 units |
| 98-112 minutes | 7 units |
| 113-127 minutes | 8 units |

175.    Under the 8-minute rule, one-on-one treatment must be provided for at least a minimum of eight (8) minutes in order to be entitled to Medicare payment. Medicare simply adds up the total minutes of one-on-one therapy, divides the total by fifteen (15), and if eight (8) or more units remain, an additional unit may be billed. If not, an additional unit is not eligible for payment. CMS, *Medicare Claims Processing Manual*, ch. 5 §§ 20.2; 20.3 (Dec. 2, 2016).

176.    However, CMS's "expectation based on the work values for the codes is that a provider's direct patient contact time for each unit will average 15 minutes in length [and provider's with] consistent practice of billing less than 15 minutes for a unit... should be highlighted for review." CMS, *Medicare Claims Processing Manual*, ch. 5 § 20.2 (Dec. 2, 2016).

177.    Thus, although some math is required to translate therapy minutes into billable units, the rules simply require that "[p]roviders report the code for the time actually spent in the delivery of...therapy services" and that "the time counted is the time the patient is treated." CMS, *Medicare Claims Processing Manual*, ch. 5 § 20.3 (Dec. 2, 2016).

178.    These rules apply regardless of whether or not patient beneficiaries are double or triple booked. For example, if one therapist individually treats two (2) patients for equal periods of time in an hour, the most timed units he/she may bill for Medicare payment is four (4) units: two (2) for the first beneficiary and two (2) for the second beneficiary.

179.    The physical therapist may divide the minutes in whatever way works best, moving back and forth between the beneficiaries to provide the various services, ***but the final calculation of total minutes and billable units remains the same regardless of that division between beneficiaries.*** One hour always results in a maximum of four (4) units regardless of how divided among beneficiaries.

180.    **Defendant RehabAuthority** knowingly and brazenly submits fraudulent billing to the Government to obtain double or triple payment for the same period of time when multiple beneficiaries receive treatments simultaneously by the same Physical Therapist.

181.    **RehabAuthority** keeps all meters running simultaneously for beneficiaries who have started their appointment but who, at various times, are either (1) performing an exercise or activity unattended, waiting for the provider to return to them, (2) sitting unattended, waiting for the physical therapist to return to them; or (3) being serviced by a "therapy technician" or other person not licensed or credentialed to provide actual therapy services for purposes of Medicare payment.

182.    Both **RehabAuthority** corporate management, like **Defendant COO Galen Danielson**, who actively push for a level of patient visit maximization only possible by double and triple booking, and **Premier Billing Services**, which reviews and submits the claims for payment, are fully aware that this practice is fraudulent, but they both nonetheless perpetuate the scheme to fraudulently bill the Government and to extract payment for services that have not, in fact, been actually performed.

53

183.    **RehabAuthority** physical therapists neither bill for group therapy, CPT code 97150, nor possess the ability to be in two places at once, rendering their **flow sheet** records and the corresponding claims for services irreconcilably false and fraudulent.

184.    The fraud is so common and so wide-spread throughout all of **RehabAuthority's** facilities that the examples in the paragraphs below involving Medicare beneficiaries are but illustrative of the full extent of this fraud and they underscore the fraud's longstanding uniformity at clinics in each of **RehabAuthority's** regions that is practiced as a corporate-wide and corporate-directed scheme.

185.    The flow sheets containing these records are given by the Physical Therapists to the individual clinic's Front Office Coordinators, who then enter the CPT codes, dates of service, and total units into RehabAuthority's MedBill (MBS) system for electronic transfer to Defendant Premier Billing Solutions, where they are processed and submitted for payment.

186.    As illustrated above, when a RehabAuthority Physical Therapist double-books two (2) beneficiaries for the same hour of treatment and bills each for four (4) units, the resulting claims constitute double billing in that RehabAuthority is billing for **twice** what Medicare would pay if it knew the therapy was not provided.

187.    As also illustrated above, double-booked patients are often "staggered," with a second patient's treatment beginning mid-way or part-way through another patient's treatment. In these cases, each patient may receive only up to 75% of their therapy one-on-one, while the Physical Therapist bills eight (8) units where only six (6) united are actually provided.

54

188.    This double-booking and overlapping scheduling is a routine practice resulting from the pressure, carrots and sticks put on the Physical Therapists by RehabAuthority management, as the games and incentives designed to increase patient visits do not distinguish between visits that are one-on-one and those that are effectively "shared" with another patient.

189.    Moreover, this practice is widespread and has been in place since at least 2010 and is continuing. The examples below are representative of thousands of identically false claims to government healthcare providers and millions of dollars in reimbursement.

190.    Likewise, Defendants' billing practices do not distinguish between simply being in the same gym as a provider and **actually receiving billable one-on-one therapy**, to the tune of hundreds of dollars per visit since at least 2010. In 2016 alone, RehabAuthority saw nearly 70,000 patients total across each of its clinics. Of these visits, nearly 21,000 were Medicare beneficiaries.

191.    RehabAuthority as a matter of policy does not schedule patients for less than one hour and, as of July 2017, employed twenty-five (25) licensed providers. In 2016 an average RA therapist provided approximately 2,760 visits. The average RA clinic is open 41 hours per week. Accordingly, even a rough calculation, assuming a weeks' vacation and ignoring the fact that many visits last over an hour, indicates that the average RA provider schedules between 1.29 and 1.36 hour-long visits per hour— confirming what Relator has observed as RehabAuthority's routine practice of double-

booking patients and double-billing for one-on-one therapy services that Defendants did not—and indeed, *could not*—provide.

192. Nonetheless, rather than shoulder the expense of hiring additional providers to staff its growing number of clinics and to ensure that patients receive the one-on-one therapy they and/or their insurers are paying for, RehabAuthority instead cheats its beneficiaries and the Government and pushes its providers to continue juggling double-booked patients, moving back and forth from patient to patient while billing each for "constant attendance" codes, or, as described below, occasionally plugging the gap in their presence by directing unlicensed, untrained, and/or non-credentialed staff to either watch the abandoned patient or, in some cases, actually provide therapy. Either way, the physical therapist falsely documents and bills for the therapy as if it had been provided by a licensed provider.

### 2. **Minnesota**

193. On April 4, 2017 at the Thief River Falls, Minnesota clinic, **RehabAuthority** Physical Therapist Kim Rosendahl recorded in his flow sheets the times and total minutes he purportedly treated both Medicare Beneficiaries J.B. and B.R. as 8:59 a.m. to 10:07 a.m. and 9:00 a.m. to 9:59 a.m., respectively. Rosendahl documented in Beneficiary J.B.'s flow sheet that he provided four (4) units of therapeutic exercise and one (1) unit of therapeutic activity and billed a total of five (5) timed units. However, Rosendahl also billed four (4) timed units, three (3) of therapeutic exercise and one (1) of neuromuscular reeducation for Beneficiary B.R., whose flow sheet indicates Rosendahl provided fifty-three (53) minutes of therapeutic exercise and eight (8) minutes

of neuromuscular reeducation. Thus, Rosendahl billed eight (8) units during the sixty (60) minutes the beneficiaries were double-booked, twice the allowed amount.

194.    On April 3, 2017 in the Thief River Falls, Minnesota clinic, **RehabAuthority** Physical Therapist Stephanie Weyrauch recorded in her flow sheets the times and total minutes she purportedly treated both Medicare Beneficiaries S.B. and A.C., as 2:00 p.m. to 3:00 p.m. and 1:59 p.m. to 3:06 p.m., respectively. Weyrauch documented in Beneficiary S.B.'s flow sheet that she provided an initial evaluation, two (2) units of neuromuscular reeducation and one (1) unit of therapeutic exercise and billed four (4) units. However, Weyrauch also billed four (4) units, three (3) therapeutic exercise and one (1) gait training, for Beneficiary A.C., whose flow sheet indicates Weyrauch also provided, after an eight (8) minute warmup, fifty-one (51) minutes of therapeutic exercise and eight (8) minutes of gait training. Thus, Weyrauch billed eight (8) units, or a minimum of two (2) hours during the sixty (60) minutes the beneficiaries were overbooked, twice the allowed amount, and including time when she was purportedly evaluating Beneficiary S.B. behind closed doors, per RehabAuthority routine practice.

195.    On October 20, 2016 in the Thief River Falls, Minnesota clinic, **RehabAuthority** Physical Therapist Kim Rosendahl recorded in his flow sheets the times and total minutes he purportedly treated both Medicare Beneficiaries A.C. and A.T. as 9:58 a.m. to 11:00 a.m. and 10:00 a.m. to 11:00 a.m., respectively. Rosendahl documented in Beneficiary A.C.'s flow sheet that he provided three (3) units of therapeutic exercise and two (2) units of manual therapy and billed a total of five (5)

timed units. However, Rosendahl also billed four (4) timed units, three (3) of therapeutic exercise and one (1) of manual therapy, for Beneficiary A.T., whose flow sheet indicates Rosendahl provided, after a six (6) minute warm-up, forty-seven (47) minutes of therapeutic exercise and eight (8) minutes of manual therapy. Thus, Rosendahl billed nine (9) units during the sixty-two (62) minutes the beneficiaries were double-booked, more than twice the allowed amount.

196.    On March 27, 2015 in the Thief River Falls, Minnesota clinic, **RehabAuthority** Physical Therapist Kim Rosendahl recorded in his flow sheets the times and total minutes he purportedly treated both Medicare Beneficiaries L.B. and O.B. as 10:45 a.m. to 11:53 a.m. and 10:49 a.m. to 12:09 a.m., respectively. Rosendahl documented in Beneficiary L.B.'s flow sheet that he provided two (2) units of therapeutic exercise and two (2) units of neuromuscular reeducation and billed a total of four (4) timed units. However, Rosendahl also billed four (4) timed units, two (2) of therapeutic exercise, two (2) of neuromuscular reeducation, and one (1) unattended modality, for Beneficiary O.B., whose flow sheet indicates Rosendahl provided thirty-five (35) minutes of therapeutic exercise, ten (10) minutes of a vasopneumatic modality, and twenty-seven (27) minutes of manual therapy. Thus, Rosendahl billed eight (8) units during the sixty-four (64) minutes the beneficiaries were double-booked, twice the allowed amount.

197.    On February 13, 2015 in the Thief River Falls, Minnesota clinic, **RehabAuthority** Physical Therapist Kim Rosendahl recorded in his flow sheets the times and total minutes he purportedly treated both Medicare Beneficiaries C.L. and J.K. as 8:55 a.m. to 10:05 a.m. and 9:00 a.m. to 9:55 a.m., respectively. Rosendahl

documented in Beneficiary C.L.'s flow sheet that he provided three (3) units of

therapeutic exercise and one (1) unit of neuromuscular reeducation and billed a total of

four (4) timed units. However, Rosendahl also billed four (4) timed units, three (3) of

therapeutic exercise and one (1) of neuromuscular reeducation, for Beneficiary J.K.,

whose flow sheet indicates Rosendahl provided forty-one (41) minutes of therapeutic

exercise and ten (10) minutes of neuromuscular reeducation. Thus, Rosendahl billed

seven (7) units during the fifty-five (55) minutes the beneficiaries were double-booked,

nearly twice the allowed amount.

198.   On March 29, 2017 in the Moorhead, Minnesota clinic, **RehabAuthority**

Physical Therapist Kristopher Peterson, recorded in his flow sheets the times and total

minutes he purportedly treated both Medicare Beneficiaries J.G and P.R, from 1:30 p.m.

to 3:00 p.m. and 2:00 p.m. to 3:00 p.m., respectively. Peterson documented in

Beneficiary J.G.'s flow sheet that he provided, after a five (5) minute warmup, eighty-

four (84) minutes of therapeutic exercise, neuromuscular reeducation, and manual

therapy and billed five (5) total units. However, Peterson also billed four (4) units, three

(3) therapeutic exercise and one (1) manual therapy for Beneficiary P.R., whose flow

sheet indicates Peterson also provided, forty-two (42) minutes of therapeutic exercise and

fifteen (15) minutes of manual therapy.   Thus, Peterson billed least seven (7) units

during the sixty (60) minutes the beneficiaries were double-booked—almost double the

allowed amount.

199.   On April 7, 2017, in the Moorhead, Minnesota clinic, **RehabAuthority**

Physical Therapist Aaron Sorvig, PT, recorded in his flow sheets the times and total

minutes he purportedly treated both Medicare Beneficiaries A.B. and G.J., from 8:50 a.m. to 10:10 a.m. and 9:30 a.m. to 10:30 a.m., respectively. Sorvig documented in Beneficiary A.B.'s flow sheet that he provided forty-five (45) minutes of therapeutic exercise, and nineteen (19) minutes of neuromuscular reeducation and billed four (4) units. However, Sorvig also billed six (6) units, three (3) therapeutic exercise, one manual therapy, one ultrasound, and one electric stimulation for Beneficiary G.J., whose flow sheet indicates Sorvig provided, forty-nine (49) minutes of therapeutic exercise, twenty (20) minutes of manual therapy, ten (10) minutes ultrasound, and fifteen (15) minutes of electric stimulation. Thus, Sorvig billed ten (10) units in one hundred forty (140) minutes, with six (6) units billed during the sixty (40) minutes that the patient beneficiaries were double-booked.

200.   On November 11, 2016, in the Moorhead, Minnesota clinic, **RehabAuthority** Physical Therapist Kristopher Peterson, PT, recorded in his flow sheets the times and total minutes he purportedly treated seven (7) Medicare Beneficiaries— E.L., G.B., J.H., J.M., J.W., R.A., and K.F.—from 7:22 a.m. to 11:55 a.m., with a different patient arriving approximately every half hour. According to each Beneficiaries' flow sheet completed by Peterson, he provided three (3) units of therapeutic exercise and one (1) unit of manual therapy to each Beneficiary, except for Beneficiary J.W., who purportedly received four (4) units of therapeutic exercise, and, in J.H and K.F' cases, a fifth unit of neuromuscular reeducation. Thus, Peterson billed thirty-one units in a two hundred seventy-three (273) minute period for which the maximum amount of billable individual therapy units is eighteen (18).

60

201.   On August 1, 2016, in the Moorhead, Minnesota clinic, **RehabAuthority** Physical Therapist Kristopher Peterson, PT, recorded in his flow sheets the times and total minutes he purportedly treated both Medicare Beneficiaries H.W. and B.A. from 9:30 a.m. to 10:45 a.m. and 9:45 to 10:50 a.m., respectively. Peterson documented in Beneficiary H.W.'s flow sheet that he provided at least fifty-one (51) minutes of therapeutic exercise and twenty-five  (25) minutes of manual therapy and accordingly billed five (5) units to the Government. However, Peterson also billed two (2) units of therapeutic exercise, and single unit of both neuromuscular reeducation and manual therapy, whose flow sheet indicates Peterson provided, after a five (5) minute bike warm-up, fifteen (15) minutes of manual therapy and at least thirty-three minutes of therapeutic exercise and eight (8) minutes of neuromuscular reeducation.  Thus, Peterson billed nine (9) timed units of therapy services in eighty minutes (80), a time period during which five (5) units is the maximum he could have provided to two Beneficiaries.

202.   On September 28, 2015, in the Moorhead, Minnesota clinic, **RehabAuthority** Physical Therapist Kristopher Peterson, PT, recorded in his flow sheets the time times and total minutes he purportedly treated four (4) Medicare Beneficiaries— W.S., L.C., H.M., and D.N.—from 9:30 a.m. to 12:00 p.m., with a different patient arriving approximately every half hour. According to each Beneficiaries' flow sheet completed by Peterson, he provided three (3) units of therapeutic exercise to Beneficiaries W.S. and D.N.; two (2) units of therapeutic exercise and manual therapy to Beneficiaries L.C. and H.M.; and one (1) unit of neuromuscular reeducation to each.

Thus, Peterson billed sixteen (16) timed units in a one hundred fifty (150) minute period for which the maximum amount of billable individual therapy units is ten (10).

### 3. Idaho

203.     On April 3, 2017, in the Eagle Road clinic in Boise, Idaho, RehabAuthority Physical Therapist Tyler Zacher recorded in his flow sheets the time and total minutes he purportedly treated Medicare Beneficiaries M.W. and M.M. from 8:59 a.m. to 9:55 a.m. and 9:02 a.m. and 9:58 a.m. During the fifty-two (52) out of the fifty-three (53) minutes during which the Beneficiaries' treatment sessions directly overlapped, Zacher billed M.W. twenty four (24) minutes / two (2) units of therapeutic exercise and thirty (30) minutes / two (2)  units of manual while purportedly providing M.M. with thirty-eight (38) minutes of manual therapy and ten (10) minutes / one (1) unit of therapeutic exercise. Thus, Zacher billed eight (8) units when a maximum of four (4) billable units were actually provided. In the afternoon the same day, he did the exact same thing, billing four (4) units each to Beneficiaries E.D. and R.D., who were doubled booked from 4:04 p.m.to 5:12 p.m. and 4:12 p.m. to 5:10 p.m., respectively.

204.     On May 24, 2017, in the Star, Idaho clinic, RehabAuthority Physical Therapist Eric Williams recorded in his flow sheets the times and total minutes he purportedly treated three (3) Medicare Beneficiaries—E.K., M.S., and R.B.—from 8:00 a.m. to 10:00 a.m., with a new patient arriving every half hour exactly. According to each Beneficiaries' flow sheet completed by Williams, he provided three (3) units of therapeutic exercise and one (1) unit of manual therapy to each Beneficiary. Thus,

Williams billed twelve (12) timed units in one hundred twenty (120) minutes, a period

for which eight (8) is the maximum amount of billable individual therapy units

205.   On October 17, 2016, in the Idaho Falls, Idaho Woodruff clinic,

**RehabAuthority** Physical Therapist Trevor Dimond recorded in his flow sheets the time

and total minutes he purportedly treated both Medicare Beneficiaries G.D. and D.M.,

from 11:05 a.m. to 12:06 p.m. and 11:06 a.m. to 12:01 p.m., respectively Dimond

documented in Beneficiary G.D.'s flow sheet that he provided, after a ten (10) minute

warm-up, fifty-seven (57) minutes of therapeutic exercise and accordingly billed four (4)

units to the Government. However, Dimond also billed four (4) units of therapeutic

exercise for Beneficiary D.M., whose flow sheet indicates Dimond provided, after a ten

(10) minute bike warm-up, forty-three (43) minutes of therapeutic exercise. Thus,

Dimond billed eight (8) units of therapeutic exercise when at most, four (4) units were

actually provided within the same time period.

206.   Also on October 17, 2016 in the Idaho Falls, Idaho Woodruff clinic,

**RehabAuthority** Physical Therapist Trevor Dimond recorded in his flow sheets the

times and total minutes he purportedly treated both Medicare Beneficiaries E.B. and

A.W.A., from 2:06 p.m. to 3:40 p.m. and 2:00 p.m. to 3:25 p.m., respectively. Dimond

documented in Beneficiary E.B.'s flow sheet that he provided, after a ten (10) minute

warmup, thirty (30) minutes of therapeutic exercise and thirty-eight (38) minutes of

manual therapy and billed four (4) units. However, Dimond **also billed** five (5) total

units, three (3) of therapeutic exercise and two (2) of manual therapy, for Beneficiary

A.W.A., whose flow sheet indicates Dimond provided, after a ten (10) minute warm-up,

thirty (30) minutes of therapeutic exercise and twenty-five (25) minutes of manual therapy during the same time period as he was treating E.B. Thus, Dimond billed at least eight (8) units during the seventy-nine (79) minutes the beneficiaries were double booked, which was double the amount allowed by Medicare: seventy-nine (79) minutes of overlap, with sixteen (16) and ten (10) minutes free or unaccounted for, respectively.

207.    On August 13, 2014, in the Nampa, Idaho clinic, RehabAuthority Physical Therapist Nate Martin, PT, recorded in his flow sheets the times and total minutes he purportedly treated Beneficiaries M.S. and B.S. from 10:55 a.m. to 12:00 p.m.  and 11:00 a.m. to 12:00 p.m., respectively. During the sixty (60) of the sixty-five (65) minutes for which the Beneficiaries were double-booked, Martin billed and purported to provide Beneficiary M.S. with three (3) units of therapeutic exercise and one (1) unit of manual therapy while also providing four (4) units of therapeutic exercise to Beneficiary B.S., for a total of eight (8) units billed where four (units)—two (2) units each—is the maximum that could have been provided.

208.    On December 16, 2011, in the Overland Road clinic in Boise, Idaho, RehabAuthority Physical Therapist Ryan Marsh, PT, recorded in his flow sheets the times and total minutes he purportedly treated Beneficiaries A.M. and N.S. from 10:00 a.m. to 11:25 and 10:08 a.m. to 11:10 a.m., respectively. Marsh documented in Beneficiary A.M.'s flow sheet that he provided five (5) units of therapeutic exercise and one (1) unit of vasopneumatic compression therapy in eighty-five (85) minutes. However, Marsh also documented and billed four (4) units of therapeutic exercise purportedly provided to Beneficiary N.S. during the sixty-two (62) minutes that her entire

appointment overlapped with Beneficiary A.M.  Thus, Marsh billed a total of ten (10) units, double the allowable amount.

### 4. North Dakota

209.    On August 30, 2013 in the Fargo, North Dakota Autumn Fields clinic, **RehabAuthority** Physical Therapist Christopher Kraemer recorded in his flow sheets the times and total minutes he purportedly treated Beneficiaries D.G., K.S. and M.I. from 9:49 a.m. to 11:00 a.m., 10:23 a.m. to 11:48 a.m., and 10:57 a.m. to 12:24 p.m., respectively. Kraemer documented in Beneficiary D.G.'s flow sheet that he provided five (5) units of therapeutic exercise and one (1) unit of manual therapy in seventy-one (71) minutes. However, Kraemer also documented and billed three (3) units of therapeutic exercise, one (1) unit of neuromuscular reeducation, and one (1) unit of manual therapy provided to Beneficiary K.S., followed by four (4) units of therapeutic exercise and one (1) unit of manual therapy provided to Beneficiary M.I.  Thus, by staggering his overlapping Medicare Beneficiaries, Kraemer billed sixteen (16) timed units in one hundred and fifty-five (155) minutes, which is only enough time for ten (10) units maximum.

210.    On January 27, 2017, **RehabAuthority** Physical Therapist Kayla Leer recorded in her flow sheets the times and total minutes she purportedly treated both Medicare Beneficiaries D.H. and M.I. from 9:45 a.m. to 10:57 a.m. and 9:53 a.m. to 11:15 a.m., respectively, at **RehabAuthority's Clinic in Bismarck, North Dakota**. Leer documented in Beneficiary D.H.'s flow sheet that she provided an evaluation, billed as one (1) unit, and also documented a unit each of manual therapy, neuromuscular

reeducation, and electric stimulation, for a total of four (4) units. However, Leer **also billed** five (5) units, two (2) of therapeutic exercise, one of manual therapy, one of neuromuscular reeducation, and one of electric stimulation, for Beneficiary M.I., whose flow sheet indicates Leer also provided at least twenty-eight (28) minutes of therapeutic exercise, ten (10) minutes of manual therapy, ten (10) minutes of neuromuscular reeducation, and fifteen (15) minutes of electric stimulation. Thus, Leer billed nine (9) units in one hundred forty (140) minutes, with at least six (6) of the units being for timed services purportedly provided during the sixty-four (64) minutes that the patient beneficiaries were double-booked.

211.    On June 24, 2016 **RehabAuthority** in the Grand Forks, North Dakota Demers clinic, Physical Therapist Kirk Hayes recorded in his flow sheets the time and total minutes he purportedly treated both Medicare Beneficiaries J.B. and L.K.., from 2:48 p.m. to 4:08 p.m. and 3:05 p.m. to 4:00 p.m., respectively. Hayes documented in Beneficiary J.B's flow sheet that he provided thirty-eight (38) minutes of therapeutic exercise and ten (10) minutes of an untimed modality and billed four (4) units to the Government. However, Hayes also billed three (3) units of therapeutic exercise and one unit of manual therapy for Beneficiary L.K., whose flow sheet indicates Hayes provided forty (40) minutes of therapeutic exercise and eight (8) minutes of manual therapy. Thus, Hayes billed seven (7) timed units when at most five (5) units could have actually provided within the same time period.

212.    On May 10, 2017 in the Fargo, North Dakota University Town

Center clinic, **RehabAuthority** Physical Therapist Tyler Burcham recorded in his flow sheets the times and total minutes he purportedly treated Medicare Beneficiaries E.O., J.B., and L.S. from 9:59 a.m. to 11:05 a.m., 10:00 a.m. to 11:10 a.m., and 10:19 a.m. to 11:40 a.m., respectively.  Burcham documented in Beneficiary E.O.'s flow sheet that he provided three (3) units of therapeutic exercise and one unit of neuromuscular reeducation in sixty-six (66) minutes. However, Burcham also documented and billed three (3) units of therapeutic exercise and one unit of manual therapy provided to Beneficiary J.B. during sixty-five (65) of E.O.'s sixty-six (66) minutes., followed by three (3) units of therapeutic exercise and one unit of neuromuscular reeducation provided to Beneficiary L.S.  Thus, by **triple booking** these patients for forty-six (46) minutes, Burcham billed twelve (12) timed units in one-hundred and one (101) minutes, which is five (5) units more than the seven (7) allowed by Medicare.

### 5.  Upper Management

213.    RehabAuthority's upper management are not only aware of and actively encouraging their employees to wittingly and unwittingly carry out the overbilling scheme, but they actively participate in it themselves. Indeed, in the course of reviewing hundreds of dates of services and thousands of claims, the single most egregious fraudulent billing came from RehabAuthority CEO and Founder **Defendant Kevin Hulsey.**

214.    On August 5, 2016 in the Idaho Homedale clinic, **RehabAuthority** Physical Therapist and CEO Kevin Hulsey, DPT, was filling in for two absent providers and recorded in his flow sheets the times and total minutes he purportedly treated

Medicare Beneficiaries M.M., M.J., and E.H. from 9:00 a.m. to 10:20 A.M. Hulsey documented in Beneficiary M.M.'s flow sheet that he provided four (4) units of therapeutic exercise and one unit of vasopneumatic therapy in eighty (80) minutes.

215.    However, at the same time and in the same place, Hulsey also documented and billed four (4) units of therapeutic exercise and to Medicare Beneficiary E.H. despite the fact that E.H.'s appointment overlapped directly with M.M.'s for seventy-five (75) of M.M.'s eighty (80) minutes, as well as three (3) units of therapeutic exercise and one unit manual therapy for Beneficiary M.J., whose appointment directly overlapped both M.M. and E.H. Thus, by **triple booking** these patients for seventy-five (75) minutes, Hulsey billed twelve (12) times units where the maximum was five (5). He went on to double book four (4) more appointments that day with Medicare and Medicaid beneficiaries, on the hour, and billed each for a full one-on-one session, netting at least thirty-two (32) additional units.

216.    On March 13, 2017 in the Idaho Falls, Idaho Sunnyside clinic, RehabAuthority Physical Therapist and corporate officer, **Defendant Adam Cope**, recorded in his flow sheets the times and total minutes he purportedly treated Medicare Beneficiaries M.B., M.E, D.W. and D.C. from 12:59 p.m. to 2:48 p.m., 1:23 p.m. to 2:45 p.m., 1:50 to 3:09 p.m., and 2:26 to 3:41 p.m., respectively. Cope documented in Beneficiary M.B.'s flow sheet that he provided sixty-one (61) minutes of therapeutic exercise, ten (10) minutes of manual therapy, and six (6) minutes of attended electrical stimulation, for a total of six (6) timed units. For Beneficiary M.E., he documented forty-

five (45) minutes of therapeutic exercise, ten (10) minutes of manual therapy, and fifteen (15) minutes of electrical stimulation for a total of four (4) timed unites.

217.    However, at the same time and place, Cope also billed five (5) timed units for Medicare Beneficiary D.W., whose flows sheet indicates Cope provided seventy-nine (79) minutes of therapeutic excise while D.W. was triple booked with M.B. and M.E for 55 minutes. Finally, Cope documented fifty (50) minutes of therapeutic exercise, fifteen (15) minutes of manual therapy, and fifteen minutes of electric stimulation for a total of four (4) timed units for Beneficiary D.C. Accordingly, Cope treated four (4) beneficiaries during one-hundred and sixty-two (162) minutes while documenting three hundred and two (302) total minutes and billing a total of eighteen (18) units to the Government.  The maximum allowable units were eleven (11), but Cope and RehabAuthority knowingly falsified the supporting records and billed seven (7) fraudulent units to the Government.

218.    On September 7, 2016, in the Homedale, Idaho clinic, RehabAuthority Chief Practice Officer and now also Physical Rehabilitation Network's Chief Compliance Officer **Defendant Matthew Smith**, PT, recorded in his flow sheets the times and total minutes he purportedly treated Medicare Beneficiaries J.B., D.W., M.A., and V.B. from 1:00 p.m. to 2:00 p.m., with the exception of Beneficiary M.A., whose appointment lasted until 2:40. In this one hundred (100) minute time span, Defendant Smith purportedly provided each Beneficiary with four (4) timed units of therapy—a full hour's worth—and accordingly billed a total of sixteen (16) timed units. However, the most he could have provided in that time span is seven (7) units. Thus, by quadruple booking a single hour-long appointment, Smith more than doubled his billing.

**C. RehabAuthority's Fraudulent Billing for Services Performed by Non-Credentialed Personnel and Supported by Records Falsely Indicating Services Provided by Licensed, Credentialed Therapists.**

219.    Defendant RehabAuthority also perpetrates a fraudulent scheme involving the practice of directing non-credentialed personnel to perform therapy services, in many instances creating a significant risk of direct harm to patients.

220.    The first iteration of this scheme involves billing for timed and service-based codes, including therapeutic exercise, manual therapy, ultrasound, and electric stimulation, and other modalities, for services that are actually provided by **non-provider support staff**. Therapy clinics in various jurisdictions refer to them as "therapy aides," but RehabAuthority labels them "therapy technicians." Regardless of their title, aides/technicians have no formal therapy training or licensure and are only allowed to assist in preparing patients for therapy, such as by helping move them and positioning the patient beneficiary or equipment, none of which may be billed to the Government health programs.

221.    However, when pushed to the scheduling limit by the double-booking scheme, physical therapists at RehabAuthority's clinics routinely turn to their non-licensed staff, including those they label therapy technicians, to "provide services" and then to bill the Government as if a physical therapist had actually provided therapy services.

222.    This routine practice results in a risk to patients, as "technicians" are neither licensed nor trained to provide therapy services, and patients seen by them simply do not

70

receive the care that they—and their insurance providers—bargained for. For example, an anonymous May 2, 2014 online review complained that "most of the therapy was with an aid, which is less than my wife was expecting."

223.   Relator has both personally observed and was directed to participate in this widespread scheme. Indeed, Idaho state regulations clearly define "supportive personnel," such as Therapy Technicians, as "individuals, who are neither a physical therapist or a physical therapist assistant, but who are employed by and/or trained under the direction of a licensed physical therapist to perform designated non-treatment patient related tasks and routine physical therapy tasks." IDAPA § 24.13.01.

224.   The next provision defines "non-treatment patient related tasks" as "[a]ctions and procedures related to patient care that do not involve direct patient treatment or direct personal supervision" such as "treatment area preparation and clean-up, equipment set-up, heat and cold pack preparation, preparation of a patient for treatment by a physical therapist or physical therapist assistant, transportation of patients to and from treatment, and assistance to a physical therapist or physical therapist assistant when such assistance is requested by a physical therapist." *Id.*

225.   Similarly, "routine physical therapy tasks" are defined as "actions and procedures   within the scope of practice of physical therapy, which do not require the special skills or training of a physical therapist or physical therapist assistant, rendered directly to a patient by supportive personnel at the request of and under the direct personal supervision of a physical therapist or physical therapist assistant."

226.   Within weeks of commencing employment with RehabAuthority in 2010 until she began working from home in 2012, Relator, with no medical training whatsoever, was directed by Matthew Smith, DPT, to provide treatment directly to patients and to perform "routine physical therapy tasks" at the Homedale, Idaho clinic without any supervision. Approximately twice per week, Smith directed Relator to independently render and apply modalities, primarily vasopneumatic compression therapy (CPT code 90716) and electric stimulation therapy (CPT code 90732), to patients after little more than a two-minute demonstration of how to properly use and apply the therapy devices. Relator can specifically recall providing these services from 2010 to 2012 to Beneficiaries B.M., J.T., J.C., M.A., C.E., S.V., S.D., K.B., K.P., B.P., and D.C.. She also recalls that she was directed to provide services to dozens more, including many Medicare and Medicaid beneficiaries. Her services were then billed as if provided by Smith.

227.   In addition, Smith directed Relator to perform ultrasound on at least two occasions. The first time, in late 2011/early 2012, Smith, sounding rushed and irritated, directed Relator to render ultrasound therapy (CPT code 97035) to a patient's hand. The only direction he gave was "don't hold it in one spot" because "it could burn the bone."

228.   Finally, on multiple occasions from the start of her employment, Smith attempted to use Relator to provide Therapeutic Exercise and Therapeutic Activities services to patients, but relator regularly refused, telling Smith that she was not comfortable rendering such services given her lack of training. However, on one occasion in 2010 or 2011, Smith handed Relator a clip board and said "you don't have a choice,"

72

before summarizing the therapeutic exercises prescribed to the patient and leaving to treat someone else. Relator felt embarrassed and awkward with the patient, as she did not know what she was doing, and afterwards she made it clear to Smith that she would not provide services beyond application of cold packs and electronic stimulation.

229.   The use of unlicensed FOCs and Therapy Technicians is routine and widespread throughout all off RehabAuthority's clinics, as it helps facilitate the double-billing scheme by allowing the licensed therapists to provide care to one patient while at least *somebody* is doing something with their double-booked patient in the interim.

230.   A small but representative sample of this routine practice includes the following cases in which the patients confirmed to Relator that, despite indication to the contrary in the Physical Therapist's Flow Sheet, they received most or all their therapy not from the Physical Therapist, but from the Therapy Technician, while the Physical Therapist treated other patients:

    a.  Between April 10, 2017 and April 28, 2017, Patient O.O. visited RehabAuthority's Boise, Idaho clinic on Eagle Road complaining of knee pain. While at each of her five (5) visits she was seen initially by her Physical Therapist of record, Tyler Zacher, these initial encounters, with the exception of her April 10, 2017 evaluation, lasted only 10-15 minutes at most, with the remainder of services provided by a therapy technician.

    b.  Between April 4, 2017 and May 5, 2017 Patient H.O. visited RehabAuthority's Boise, Idaho clinic on Overland Road complaining of

knee pain. While at each of his twelve (12) visits he was seen initially by his PT of record, Ryan Marsh, these initial encounters, with the exception of his April 4 evaluation, lasted only 10-15 minutes maximum, with the remainder of services provided by a technician.

c.   Between January 4, 2012 and February 22, 2012 Patient J.L visited RA's Homedale, Idaho clinic complaining of lower back pain and radiculopathy. While at each of his three (3) visits he was seen initially by his PT of record, Brett Homstad, these initial encounters, with the exception of his January 4 evaluation, lasted only 5-10 minutes maximum, with the remainder of the services provided by a technician.

231.   Since no later than 2011, RehabAuthority has submitted thousands of claims for units of TE, TA, and MT provided by technicians with no licensure, training, or medical background whatsoever. As indicated above, Medicare does not pay for services provided by technicians—also called "aides"—regardless of the level of supervision.

232.   However, technicians and FOCs are not the only RehabAuthority employees illegally providing services billed as if provided by a properly credentialed provider. Unwilling to let the Medicare credentialing process stand in the way of newly hired providers' contributions to the all-important patient visits totals, RA simply allows such non-credentialed PTs to provide services but then bills them under the name of a different PT who is properly credentialed. The credentialing, or "enrollment" process enables providers to contract with Medicare to receive reimbursement for treating

74

Medicare beneficiaries 42. C.F.R § 424.505. Enrolled providers submit

"[d]documentation associated with regulatory and statutory requirements necessary to

establish a provider's or supplier's eligibility to furnish Medicare covered items or

services to beneficiaries in the Medicare program." 42. C.F.R § 424.510(d).

233.   A sample of this scheme, which underscores the utter disregard RA has for

the Medicare billing rules and the credentialing process that binds providers to them,

includes the following:

    a.   According to Relator's information and belief, Trevor Dimond, DPT,

        was not Medicare credentialed until April 11, 2015. Yet, initialed flow

        sheets reveal that Dimond began seeing Medicare patients as early as

        February 2015, including twelve (12) visits with Patient-Beneficiary

        D.H. between Feb.13 and April 4, 2015 at RA's Woodruff Ave. clinic in

        Idaho Falls, Idaho clinic. The approximately thirty-five (35) units of

        therapy provided by Dimond was submitted for billing as if performed

        by credentialed PT Greg Bailey, who signed D.H.'s SOAP notes.

    b.   According to Relator's information and belief, Nicholas Hartley, DPT,

        was not Medicare or Medicaid credentialed until April 15, 2015. Yet,

        SOAP note annotations reveal that Hartley began treating, or

        supervising the treatment of, Medicare and Medicaid patients as early as

        February 2015, including thirteen (13) visits by Medicaid Beneficiary

        A.E. between Feb.25 and March 27, 2015 at RehabAuthority's

        Homedale, Idaho clinic. The approximately sixty-four (64) units of

therapy provided or supervised by Hartley were submitted for billing as

if performed or supervised by credentialed PT James Muir, who signed

D.H.'s SOAP notes. Hartley also treated, supervised and billed for

therapy services provided to Medicaid Beneficiary S.W. during at least

(10) visits between Jan. 23 and March 11, 2015.

c.  According to Relator's information and belief, Evan Applegate, DPT,

was not Medicare or Medicaid credentialed until Sept. 21 and Oct. 5,

2015, respectively. Yet, SOAP note signatures and clinic schedules

reveal that Applegate began treating, or supervising the treatment of,

Medicare and Medicaid patients on Aug. 12, 2015, including three (3)

visits by Medicaid Beneficiary J.W. on Aug. 12, 17 and 24 at

RehabAuthority's Homedale, Idaho clinic. All six (6) units of therapy

provided or supervised by Hartley were submitted for billing as if

performed or supervised by credentialed Therapist Nicholas Hartley,

DPT, who initialed J.W.'s flow sheets. However, according to the

clinic's daily schedule, Hartley was not even present in the clinic on

Aug. 24 when J.W. was discharged. Applegate also provided therapy to

Medicare Beneficiary D.B. on Aug. 24, Sept. 2, and Sept. 4, 2015,

billing a total of eight (8) units under Hartley's name and license.

d.  According to Relator's information and belief, Andrea Rowan, DPT,

was not Medicaid or Tricare credentialed until Aug. 25 and 26, 2016,

respectively. Yet, SOAP note signatures and clinic schedules reveal that

Rowan began treating Medicaid patients in early August, 2016,
including seven visits by Medicaid Beneficiary K.P. between Aug. 1
and 23, 2016 at RehabAuthority's Kuna, Idaho clinic. All seventeen
(17) units of therapy provided or supervised by Rowan were submitted
for billing as if performed or supervised by credentialed Therapist Paul
Vinci, DPT, who signed all but one of K.P.'s SOAP notes—the SOAP
note generated on the first visit. Vinci remembered to falsely sign the
August. 1, 2016 initial evaluation form, but Rowan, who actually did
the evaluation, signed the accompanying SOAP note herself, exposing
the fraud. Rowan also evaluated Tricare Beneficiary R.T. on August. 9,
2016 and treated him on Aug. 11, 16, 18, and 23, 2016 prior to being
Tricare credentialed.

e. According to Relator's information and belief, Jamie Hillesland, OT,
was not Medicare credentialed until May 1, 2015. Yet, scheduling
records, flow sheets, and annotated SOAP notes indicate that she
provided therapy to Medicare and Medicaid patients regularly since her
RehabAuthority "orientation" on Jan. 9, 2014 as a "fill in" for
credentialed OT Mary Lynn Bernston, including Beneficiaries S.N.,
B.G, J.B, K.H., B.O., E.F., A.S., M.S., B.J., J.S., S.O throughout 2014;
and S.C, K.R., K.R., J.S., C.H., S.H., L.D., M.O., C.H., J.B., and M.M.
through April 2015.

234.     Relator first noticed this practice in April, 2014 in connection with the
above example involving Ms. Jamie Hillesland, RehabAuthority's sole occupational
therapist. Concerned that Hillesland's claims might be denied, Relator emailed Premier
Billing CEO Amy Roe on April 8, 2014 asking "if it is ok that we are billing (evals)
under Mary Lynn while she is out of the office and has a fill-in." Roe responds,
"Unfortunately yes as I guess there is a fill in. **The person is not contracted, so I guess I
am not to know.**" (emphasis added).

235.     Confused by Roe's cryptic response, Relator immediately sought
clarification from then-President of Practice Education and Outreach Matthew Smith.
Smith, now Physical Rehabilitation Network, LLC's, Chief Compliance Officer,
responded, "Yes we are aware."

236.     Finally, RehabAuthority in Minnesota regularly exploits the fact that
Minnesota state law, as described above, allows physical therapist assistants, and in some
cases physical therapy students, to practice under the supervision of a Physical Therapist
who is not physically present on-site.

237.     For example, patient scheduling and treatment records reveal that
RehabAuthority Thief River Falls, LLC physical therapist assistant Alicia Backer treated
multiple patient-beneficiaries alone and unsupervised, while the physical therapist of
record, Kim Rosendahl, was not even present in the office on September 19, November
28, and December 5, 2014; June 1 and July 20, 21, 22, and 23, 2015; and July 20, 2017.
Similarly, patient scheduling and treatment records reveal that student therapist Krishaun
Turner on June 5, 2017 treated at least two patient-beneficiaries at the RehabAuthority

78

Woodruff, LLC clinic in Idaho Falls, Idaho while the therapist of record, Greg Bailey,

was off-site and the only other therapist, Trevor Dimond, was in an evaluation room with

a different patient. This illegal use of students also occurred as far back as March 17,

2014, when RehabAuthority Kuna, LLC student therapist Garret Weldon treated a

patient-beneficiary while licensed therapist Paul Vinci treated two different patients at the

same time, including an initial evaluation.

### D. Defendant's Illegal Waiver of Beneficiary Co-Payments and Deductibles

238.   In most cases, Medicare beneficiaries must pay a portion of the cost of their

therapy. Medicare and most other government payors that provide coverage to

RehabAuthority's customers require that the customer pay a 20% "co-payment" in

addition to a deductible. While RehabAuthority typically tries to collect co-payments at

the time of service, oftentimes they are billed to the customer or applicable secondary

payor on a weekly billing cycle.

239.   Under 42 U.S.C. § 1320a-7a, any person or entity that offers or give

"remuneration" to a beneficiary, knowing that such remuneration is likely to influence

the beneficiary to order or receive from a particular provider any service for which a

Medicare payment may be made, is subject to a civil monetary penalty. "Remuneration"

includes the waiver of co-insurance and deductible amounts, unless: (1) the waiver was

not offered as part of an advertisement or solicitation, (2) the provider does not routinely

waive coinsurance or deducible amounts, and (3) the provider waives the co-payments or

deductible amounts "after determining in good faith that the individual is in financial

need" or because the provider could not collect the coinsurance or deductible amounts after making reasonable collection efforts.

240.    RehabAuthority does not meet this narrow regulatory safe harbor. Rather, RehabAuthority knowingly treats government healthcare beneficiaries just like its other patients in that it offers certain patients "deals" to come to RehabAuthority for therapy. The patients are selected either because they are "friends and family" or because RehabAuthority management has determined it is worth offering them a deal in order to attract their business. No good faith determination of financial need or reasonable effort to collect is made.

241.    On May 20, 2014, RehabAuthority Chief Administrative Officer Nikki Walker emailed all Front Office Coordinators regarding a new internal form called a "write-off report" to be used to record the provision of discount and "deals"—including complete write-offs of amounts otherwise owned by patient—rather than expressly documenting the deals in the notes that accompany the billing records sent to PBS, where deals would be reflected monthly on the "Aged Account Reports," which record patients' outstanding balances.

242.    "Instead," wrote Walker, "[FOCs] will fill this out and fax it to PBS on the 28th of each month. The form will be for all 'deals'—family, friends, trade outs, out-of-network, etc." However, to ensure that the billing record included *some* indication of the deal so as not to slow up the claims submission process, Walker further directed the FOCs in the same email, that:

*If there is a deal, you will document one of the codes below in the Financial Statistics Page of MBS by simple putting A, B, C, or D— nothing else. On the new form under the section [RA] approval, I would like you to write the code WITH an explanation. For example, C: [RA] agreed to $20 copay instead of $40 or D: [RA] will honor in network benefits of $20 copay instead of $40.*

243.    Walker then provided the "deal codes":

A = Complete write-off
B = Insurance only
C = Reduction of copay or coinsurance
D = honor in-network benefits."

244.    Nonetheless, RehabAuthority FOCs would occasionally revert back to their old practice and note the "deal" on the Financial Statistics page of the patients' account and billing records. These "mistakes" resulted in a March 16, 2016 email from PBS employee Christine McDaid to Relator, two other FOCs, and CAO Walker in which McDaid states:

*Please see the Financial Stats page where we put arrangements. When billing insurance, we can't put things about us accepting something lower than what insurance tells us is patient responsibility (i.e. accepting a lower co-pay, writing services off after insurance pays, trading services etc.)*

*If the account was ever audited by insurance or becomes part of a legal suit, we could get in big trouble with that insurance carrier because it would be a breach of our contract and our fee schedule could be penalized for all future patients.*

245.    McDaid in her email then reminds the recipients of the above-described practice of simply indicating Plan A through D, and that:

*[w]hen you want PBS to know what exactly the arrangement is, please put it on the monthly spreadsheet that you send to Amy Roe. If Jen Mitchell (statement gal) needs to know what the arrangement is, she'll e-mail or call.*

246.   Finally, McDaid notes to Relator, CAO Walker, and Senior FOC Ann-Jean Yuly, that she's "been seeing this A LOT lately from several clinics," supporting Relator's personal observation that RA's practice of offering "deals" is longstanding and widespread.

247.   A small but representative sample of the Medicare beneficiaries who received "deals" in the form of the reduction or waiver of copayments include the following:

a.   In June 2017, Beneficiary G.W. was granted a "Plan C" reduction of a $20 copayment.

b.   On or about Feb. 13, 2017, Beneficiary D.S was granted a "Plan B" waiver of a $20 per-visit copayment, resulting in a total of$1,020.00 written off over the course of fifty-one (51) visits.

c.   On or about Aug. 11, 2016 Beneficiary S.R. was granted a "Part B" waiver of a $15 per visit copayment, resulting in a total of $85.49 written off over the course of seven (7) visits.

d.   On or about May 3, 2016, -Beneficiary D.A., the grandfather of an RA employee, was granted a "Plan B" waiver of a deductible and copayment, resulting in a total write-off of $71.85.

e.   On or about Jan. 4, 2016, Beneficiary L.C. was granted a "Plan C" reduction of her $20 per-visit copay, resulting in a total of $660 written off over the course of thirty-three (33) visits.

    f.   On or about June 5, 2015, Beneficiary P.J. was granted a "Plan B" waiver of four $40 copayments, resulting in a total of $160 written off over the course of four (4) visits.

    g.   On or about July 10, 2012, Beneficiary L.A. was granted a "Plan B" waiver of her 20% coinsurance obligation, resulting in a total of $406.87 written off over the course of her treatment. A subsequent "Plan B" waiver was granted to Beneficiary L.A. on or about July 13, 2016, which resulted in a total write-off of $410.41.

248.   RehabAuthority authorizes and encourages PTs to waive patient-beneficiary's payment responsibilities whenever they think that doing so would please RehabAuthority's employees, "friends or family" or otherwise generate business or referrals or induce beneficiaries to seek and receive therapy.

249.   Waivers of co-pays and deductibles are unlawful because such "deals" misrepresent providers' actual charge for the service at issue, which results in Medicare overpayments. RehabAuthority's own employee handbook, under the section titled "Insurance Fraud," recognizes that "patients are required to pay for Co-Payment/Co-insurance at the time care is delivered" and that RA will "review 'financial hardships' on a case by case basis at the Corporate Office."

### E. RehabAuthority's  Intentionally Indiscriminate Use of Unbundling Modifiers

250.   Federal regulations, specifically 45 C.F.R. § 162.1002(a)(5), (b)(1), designate the American Medical Association's Current Procedural Terminology ("CPT")

and the Centers for Medicare & Medicaid Services Common Procedure Coding System ("HCPCS") as the standard codes to be used for physician services and other health care services.

251.   While some of the physical therapy CPT codes at issue here have been introduced above for reference, CPT codes are generally ranged so as to describe services of increasing complexity or that consume an increasing amount of the provider's time, such that the higher number code reflects a procedure for which the provider would be compensated at a higher rate than the lower-numbered code. Many CPT codes describe services which are **part of or included in services described by other, more inclusive CPT codes**. Billing for services by using the separate codes for each of the included services, when the services are more accurately described under a single, "inclusive" code, to increase reimbursement is a fraudulent practice known as 'unbundling."

252.   Beginning in 1999, CMS developed the National Correct Coding Initiative (NCCI) to promote national correct coding methodologies and to control improper coding leading to inappropriate payment in Part B claims. CMS developed its coding policies based on coding conventions defined in the American Medical Association's CPT Manual, national and local policies and edits, coding guidelines developed by national societies, analysis of standard medical and surgical practices, and a review of current coding practices.

253.   Accordingly, the NCCI annually publishes a multi-volume Coding Manual addressing thousands of "edit pairs" or combinations of two codes reflecting two services "usually performed as part of [a single] procedure as a standard of medical/surgical

practice." Providers must "report the HCPSCs/CPT code that describes the procedure performed to the greatest specificity possible" and use it "only if all services described by the code is performed." Moreover, a "physician should not separately report these services simply because HCPCS/CPT codes exist for them." NCCI, NCCI Policy Manual for Medicare Services, Ch. XI, § A (Jan. 1, 2017).

254.    Accordingly, the rationale for determining which codes are "paired" and "bundled," i.e. billed only for the code in the pair deemed to be more inclusive, is reflected CMS and NCCI's organization of the edit pairs into "Medically Unlikely" edits and "Procedure-to-Procedure ("PTP")" edits. The former are code pairs that reflect services that, are not, together, medically necessary, while the latter simply reflects codes where the reality of the type of services suggests a likelihood of overlap in which one or both services are not being fully provided.

255.    However, edit pairs are not *always* bundled. If the provider properly documents that the two services were indeed medically necessary and provided separately, they can bill the two codes along with a "modifier" indicating that the codes are to be "unbundled" and billed individually. This modifier—"modifier 59"—is defined by CMS and the CPT Manual as indicating a "distinction procedural service," which is defined as a procedure or service was distinct or independent" from each other and "appropriate under the circumstances."

256.    Documentation for billing a 59 modifier-appended edit pair "must support a different session, different procedure or surgery, different site or organ system, separate incision/excision, separate lesion, or separate injury (or area of injury in extensive

injuries) not ordinarily encountered or performed on the same day by the same

individual." CMS, *Modifier 59 Article*, (2014), available at

https://www.cms.gov/Medicare/Coding/NationalCorrectCodInitEd/downloads/modifier5

9.pdf

257.    While NCCI edit pairs effect every health care industry, particularly

surgery practices, PTP edit pairs have a particular impact on outpatient therapy practices,

where certain CPT codes and services, such as Therapeutic Exercises, Therapeutic

Activities, and Manual therapy can easily overlap, with one becoming the other in matter

of minute or seconds.

258.    Accordingly, CMS actually uses the PTP edit pair of **97140** (MT

techniques: "e.g. mobilization, manual lymphatic drainage, manual traction, 1or more

regions, each 15 minutes"); and **97530** (TA: direct, (one-on-one) patient contact, use of

activities to improve functional performance, each 15 minutes") to illustrate the proper

and improper use of modifier 59, stating:

> "Modifier 59 may be reported if the two procedures are
> performed in distinctly different 15 minute time blocks. For
> example, one service may be performed during the initial 15
> minutes of therapy and the other service performed during the
> second 15 minutes of therapy...CPT code 97530 should not be
> reported and modifier 59 should not be used if the two
> procedures are performed during the same time block.

CMS, Modifier 59 Article, (2014), p. 9 available at
https://www.cms.gov/Medicare/Coding/NationalCorrectCodInitEd/downloads/
modifier59.pdf

259.    RehabAuthority's flow sheets, described above, are completed by hand and

are neither designed nor completed in a way that makes it at all possible to determine

what "time block" the various therapies are provided during the course of a patient visit. Likewise, while the SOAP note describes MT and TA separately, there is nothing documented specifically indicating *when* they were provided or how the 59 modifier is appropriate. This is because RehabAuthority's physical therapists, at the direction of PBS and with the knowledge of RA corporate management, simply add the 59 modifier to every MT/TA edit pair to ensure maximized, unbundled reimbursement regardless of how or when the services are actually provided.

260.   For example, on April 1, 2014, Ann-Jean Yuly, the head FOC and FOC for RA's corporate office, emailed the entire FOC staff, asking that they respond to confirm their receipt of the email which stated "The modifier 59 is for all insurance companies. Sorry this wasn't clear but the 59 mod needs to be **on every bundle you see.**" (emphasis added). The same email forwarded a March 31, 2014 email with a document attached which Yule referred to as a "cheat sheet with some of the 59 modifier info."

261.   The "cheat sheet" document listed "59 Modifier Bundles" as MT and TA; MT and GT; MT and Traction; TA and Gait; TA and Traction; or Gait and Traction" and indicated which services received the modifier, stating: "59 modifier always goes on the MT if that is in the bundle…The PT knows that if they are billing any of these they have to justify why they are using them." The cheat sheet then refers to the "distinct or independent" requirement referenced above.

262.   As described above, RehabAuthority PTs fail to properly document their "justification" for the separateness of the bundled services. This is because, as reflected in the email above, RehabAuthority's PTs simply "always" tack on the modifier

whenever the bundled services are purportedly provided—they are not changing their practice to ensure the services are actually provided in separate 15 minute "time blocks" as required by Medicare. Indeed, as a result of the double-booking scheme above, RehabAuthority providers are hardly able to provide full fifteen-minute time blocks of any services, much less reorganize a treatment session to split up services identified by NCCI for bundling because of their tendency to be grouped together.

263.   Accordingly, the precise scope of the improper unbundling scheme is difficult to determine. However, in a March 25, 2014 email, PBS CEO Amy Roe pleaded with the FOCs as follows: "The PT's are starting to use these codes that bundle now and we have **hundreds of denials/day** because the charges are not having the 59 modifier applied. PLEASE, PLEASE, PLEASE make a big note or have some kind of self-reminder about these modifiers."

264.   In the same email, Roe, in the context of chastising the Front Office Coordinators for their "charge selection" states: "We are also trying to get you paid as fast and as much as we can so you are profitable and bonuses can be received." Per CMS guidelines regarding specific subsets of the 59 modifier, RA's use of the modifier is indicated with the code "XU."

265.   Between its October 2011 opening and July 25, 2017, RA billed 27,281 units of MT at its Idaho Falls, Idaho clinic alone.

266.   False claims submitted for improperly unbundled TA and MT edit pairs involving Medicare and Medicaid Beneficiaries include the following:

a. On July 5, 2016, Christopher Kraemer, PT treated Medicare Beneficiary S.L. for back pain. Nothing in his documentation justifies the unbundling documented in S.L.'s MBS account, which resulted in false claims for 2 extra MT units when only 1 TA unit was proper.

b. On January 30, 2015 Mark Thompson, PT treated Medicare Beneficiary E.W. for back pain at RA's Idaho Falls, ID clinic. Nothing in his documentation justifies the unbundling documented in E.W.'s MBS account, which resulted in a false claim submitted for 1 extra MT unit when only 1 manual traction unit was proper. Thompson also improperly unbundled two units of MP and TA on Jan. 19, 2015 with the same patient.

c. On August 28 and September 25, 2015 Nathan Hunsacker, PT treated Patient-Beneficiary P.T. for neck pain at RA's Idaho Falls, ID clinic. Nothing in his documentation justifies the unbundling documented in P.T.'s MBS account, which resulted in false claims submitted for 2 extra MT units per visit when only 1 manual traction unit was proper.

d. On December 9 and 14, 2016, Jed Loertscher, PT treated Medicaid Beneficiary K.M. for ankle pain at RA's Idaho Falls, ID clinic. Nothing in his documentation justifies the unbundling documented in K.M.'s MBS account, which resulted in false claims submitted for 1 extra MT units per visit when only 1 gait training unit was proper.

e. On May 12, 2017, Christopher Kraemer, PT, treated Medicaid

Beneficiary S.B. for knee pain at RA's Autumn Fields, ID clinic.

Nothing in his documentation justifies the unbundling documented in

S.B.'s MBS account, which resulted in false claims submitted for 2

extra MT units per visit when only 2 TA units was proper.

267.    Given Relator's receipt of directives from Roe of PBS and her observations

in the course of her duties as an FOC of the automatic application of the "XU" (59)

unbundling to any codes that would otherwise be bundled, along with the fact that the

bundled codes, such as MT and TA, are some of the most commonly performed

procedures, this fraud scheme could easily have cost government healthcare programs

tens of thousands of dollars, if not more, over the past four years.

### F. RehabAuthority's Failure to Return Identified Medicare Overpayments Within 60 days

268.    Under 31 U.S.C. 3729(a)(1)(G), the FCA imposes liability for a so-called

"reverse false claim" on anyone who "knowingly conceals or knowingly and improperly

avoids or decreases an obligation to pay or transmit money or property to the

Government." "Knowingly" is defined to include "actual knowledge of the existence of

the overpayment." 31 U.S.C. 3729(b)(1)(A); 79 Fed. Reg. 29,843, 29,920 (May 23,

2014).

269.    An "obligation" includes "an established duty ... arising from ... the

retention of any overpayment," 31 U.S.C. § 3729(b)(3), including "any overpayment

[from Medicare] retained by a person after the deadline for reporting and returning an

overpayment." 79 Fed. Reg. 29,843, 29,918 (May 23, 2014). An "overpayment" is defined as "any funds that a person receives or retains under [the Medicare and Medicaid statutes] to which the person, after applicable reconciliation, is not entitled." 42 U.S.C. § 1320a-7k(d)(4)(B).

270.    The Patient Protection and Affordable Care Act of 2010 ("ACA") requires a person who receives an overpayment of Medicare or Medicaid funds to report and return the overpayment within 60 days of the date on which the overpayment was identified. 42 U.S.C. § 1320a-7k(d)(1)-(2).

271.    In addition to fraudulent billing and/or insufficient documentation by providers submitting claims, Medicare overpayments can also happen as result of the administrative and/or processing errors. If Medicare identifies an overpayment of $25 or more, the Medicare Administrative Contractor (MAC) sends a demand letter to initiate the overpayment recovery and appeals process. However, in part because Medicare's ability to identify overpayments and conduct audits is limited, the above-cited ACA provision drastically increased the responsibilities triggered by "self-identified" overpayments which, for a myriad of reasons, have not been discovered by the MAC— providers cannot wait and hope that Medicare never finds out about the overpayment. They have to pay it back, *and* look back potentially years, to determine if there have been any others.

272.    In addition to each of the wrongfully obtained—and therefore wrongfully retained—payments made to RehabAuthority as a result of its knowing implementation above-described billing schemes, RehabAuthority has on occasion simply been paid too

much by Medicare. However, rather than paying it back, RehabAuthority retains the

overpayments, and, when they believe enough time has passed that the records of the

overpayments will not be audited, destroys them.

273.    For example, on November 14, 2016, RehabAuthority Stacy James emailed

Relator about a "project," asking if she was able "to add a couple more hours to your

weekly schedule to 'clean house' in MPS." James prefaced the vague request, stating

"Please, please know PBS keeps a fabulously 'clean house,' I just want to metaphorically

go digging in the attic and the basement [and] you have the precision and commitment

that this project will take. If you wish to go on this adventure, just give me a call…"

274.    Upon speaking with James, Relator learned that the project included

manually identifying information—by highlighting patient accounts and amounts owed to

Medicare indicated RehabAuthority's A/R or "Aged Accounts Reports." The reports

indicate overpayments as "credits" owed to patients' insurers. James specifically directed

Relator to analyze reports from before 2014 because it was "outside the range" she

thought the government might audit. Relator was directed to print the reports and, using

green highlighter, indicate the "insurance refunds" owed so that Amy Roe could

"remove" them. After receiving Relator's first highlighted batch of reports, James

thanked Relator in a November 30, 2016 email for using her "super sleuth skills" and

reminded her to "please, please, keep the original [document] safely and securely with

you."

275.    Relator did as directed and sent the highlighted reports to James in

February 2017 with a total of nearly $50,000 in overpayments made by the government

and private health insurance providers identified in green highlighter. Relator learned that these "credits" were then "zeroed out" so that no record of the overpayments would remain recorded in the patients' billing records.

276.    Relator has personally observed dozens of post-2014 overpayments received from Medicare and Medicaid that have been retained years in some cases, sitting in patient-beneficiaries MBS accounts under the "Financial Statistics" where they are indicated under the "owed" to the patients' "insurance." For example:

      a.  Billing records indicate RehabAuthority identified a $101.50 overpayment from Medicare no later than April 13, 2015 for therapy provided to Patient-Beneficiary S.A. No attempt to repay or investigate other overpayments has been made.

      b.  Billing records indicate RehabAuthority identified a $121.33 overpayment from Medicare no later than Dec. 31, 2016 for therapy provided to Patient-Beneficiary A.C. No attempt to repay or investigate other overpayments has been made.

      c.  Billing records indicate RehabAuthority identified a $318.00 overpayment from Molina Medicaid – Idaho no later than Dec. 31, 2016 for therapy provided to Patient-Beneficiary M.S. No attempt to repay or investigate other overpayments has been made.

277.    As described above, the free and cavalier way in which the Chief Financial Officer of the RehabAuthority was acting played a primary role in Relator's decision to investigate her employer's compliance with Medicare regulations.

278.    This investigation began in April 2017 when Relator learned that her position as Data Checker was being eliminated following RehabAuthority's decision to transition electronic medical records as part of the acquisition of Defendant Idaho Rehabilitation Partners, LLC by Physical Rehabilitation Network, LLC. Relator was told by CAO Walker in June 2017 to review the MBS system to see if there was a "role" she could fill. Relator thought there may be some compliance issues she could help clean up, but was shocked when she discovered a widespread, longstanding fraud scheme built on shortchanging patients as well as taxpayers.

### G.    RehabAuthority and Premier Billing Solutions' Conspiracy to Submit False Claims for Payment, Falsify Records in Support of False Claims, and Conceal Overpayments

279.    As introduced above, Defendant Premier Billing Solutions (PBS) is Defendant RehabAuthority's exclusive provider of medical billing services. **RehabAuthority** is one of PBS's largest clients, and PBS's owner, founder, and Chief Executive Officer, Defendant Amy Roe, and subordinates under her direct supervision, such as Christine McDaid, personally review RehabAuthority's claims and instruct RehabAuthority's upper management, therapists, and Front Office Coordinators ("FOC's") regarding how to document their billing on the "Flow Sheets" from which billing information is entered into the MBS software and electronically transmitted to PBS for submission to payors, including Government Payors.

280.    Accordingly, PBS is not only aware of each of the above billing schemes, but, as RehabAuthority's co-conspirator and primary source of billing expertise since at least 2010, knowingly complicit in the submission of false claims for payment.

281.   For example, as also indicated above, PBS employee Christine McDaid on March 16, 2016 emailed RehabAuthority Chief Administrative Officer Defendant Nicole Walker instructions for how RehabAuthority employees should conceal illegal co-payment waivers, stating that unless a coded system was used to indicate such "deals," "[if the account was ever audited by insurance or becomes part of a legal suit, we could get in big trouble...."

282.   Similarly, and as also described above, Defendant PBS's CEO Amy Roe not only personally instructed RehabAuthority's FOC's regarding the indiscriminate application of the unbundling modifier but also, accordingly to the November 30, 2016 email from RehabAuthority CFO Stacey James, personally concealed the evidence of the overpayments received from Government payors and other insurers identified by RehabAuthority.

283.   Indeed, rather than ensuring that RehabAuthority's billing is accurate and claims submitted in compliance with anti-fraud provisions—the legal business function of a medical billing company—**Premier Billing Solutions'** agreement with **RehabAuthority** is that it will maximize RehabAuthority's reimbursement by, inter alia, submitting claims PBS knows are false.

284.   Although directly pertinent only to scienter generally, a July 14, 2014 email Defendant Roe sent regarding an Idaho state agency's review of RehabAuthority's re-evaluation billing powerfully illustrates the conspiratorial relationship between Defendants RehabAuthority, Premier Billing Solutions, and Amy Roe: **"I did notice some errors on documentation that I hope they don't catch."**

285.    In addition to receiving at least five (5) to eight (8) percent the payments it obtains for RehabAuthority, Premier Billing Solutions receives discounted therapy services for its employees from RehabAuthority as a kickback to ensure the commitment Roe displays when she works to prevent the government from "catching" the falsification.

## IX.    COUNTS

### COUNT ONE
### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(A)

**False Claims for Services Not Provided to Double-Booked Patients, who were Either Left Untreated or Treated By Non-credentialed Personnel, as if They Received Continuous, Face-To-Face, Individual Services**

286.    Relator realleges and incorporates by reference the allegations of all previous paragraphs as if restated herein

287.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

288.    31 U.S.C. § 3729(a)(1)(A) states that "any person who . . . knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval" is liable under the Act.

289.    By engaging in the conduct set forth herein, Defendants have knowingly presented or caused to be presented false or fraudulent claims for approval in violation of 31 U.S.C. § 3729(a)(1)(A).

290.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

291.    By reason of Defendants' acts, the United States has suffered substantial actual damages.

## COUNT TWO

### False Claims Act, 31 U.S.C. § 3729(a)(1)(A)
**False Claims for "Unbundled" Services Not Actually Provided in Separate Time Periods**

292.    Relator realleges and incorporates by reference the allegations of all previous paragraphs as if restated herein.

293.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

294.    31 U.S.C. § 3729(a)(1)(A) states that "any person who . . . knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval" is liable under the Act.

295.    By engaging in the conduct set forth herein, Defendants have knowingly presented or caused to be presented false or fraudulent claims for approval in violation of 31 U.S.C. § 3729(a)(1)(A).

296.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

## COUNT THREE

### False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
**Defendants' Falsification of Records—Including Billing Records, Claims Forms, and Medical Records—In Support of False Claims for Therapy Services Not Provided**

297.    Relator realleges and incorporates by reference the allegations of all previous paragraphs as if restated herein.

298.    31 U.S.C. § 3729(a)(1)(B) states that "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable under the Act.

299.    By engaging in the conduct set forth above, Defendants have knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims within the meaning of § 3729.

300.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

301.    By reason of Defendants' acts, the United States has suffered actual damages.

## COUNT FOUR

### False Claims Act, 31 U.S.C. § 3729(a)(1)(C)
**Conspiracy Between Defendants RehabAuthority and Premier Billing Solutions and their Respective Defendant Management Personnel to Violate The False Claims Act**

302.    Relator realleges and incorporates by reference the above allegations made in Paragraphs 1 through 214 as if fully restated herein.

303. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

304. Defendants RehabAuthority, LLC, Kevin Hulsey, Galen Danielson, Adam Cope, Matthew Smith, Nichole Walker, Amy Roe, and Premier Billing Solutions have, pursuant to agreements explicit and implicit amongst themselves and through the Defendant entities they control, committed overt acts to present, or cause to be presented, false and fraudulent claims for payment and to make, or cause to be made, false records and statements material to false or fraudulent claims.

305. Because of Defendants' conduct, the United States has suffered substantial actual damages.

## COUNT FIVE

### False Claims Act, 31 U.S.C. § 3729(a)(1)(G)
### Improper Retention of Medicare Overpayment / Reverse False Claim

306. Relator realleges and incorporates by reference the allegations of all previous paragraphs as if restated herein.

307. 31 U.S.C. § 3729(a)(1)(G), imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

308. Defendants knew, both when RehabAuthority received payments from Government-funded insurance programs for intentionally false claims as well as when

RehabAuthority received payments from the Government programs that exceeded the actual cost of the services for which claims for payment had been submitted, that RehabAuthority needed to review its records for the same overbilled claim submitted to the Government as well as overpayments received from the Government and that it needed to reimburse the government for all such overpayments.

309. Through the acts described above, by knowingly concealing money that was owed to the Government when Defendants failed to return to the Government payment received for services Defendants knew were not medically necessary or otherwise did not qualify for reimbursement under the Medicare program or were overpayments.

310. By reason of Defendants' acts the United States has suffered actual damages.

## COUNT SIX

### Minnesota False Claims Act, Minn. Stat. § 15C.02(a)(1),(2),and (3)
### Defendants' Conspiracy to Submit False Claims for Payment For Therapy Services and Falsify Records in Support Thereof

311. Relator realleges and incorporates by reference the allegations of all previous paragraphs as if restated herein.

312. This is a *qui tam* action brought by Relator on behalf of the State of Minnesota to recover treble damage and civil penalties under the Minnesota False Claims Act, Minn. Stat. § 15C.01, *et seq*.

313. Defendants RehabAuthority Moorhead, LLC, RehabAuthority Thief River Falls, LLC, RehabAuthority, LLC; Idaho Rehabilitation Partners, LLC, Physical

Rehabilitation Network, LLC; Physical Rehabilitation Network Holdings, LLC, Premier

Billing Solutions, LLC, Kevil Hulsey, Galen Danielson, Matthew Smith, Nichole Walker,

Adam Cope, and Amy Roe violated Minn. Stat. § 15C.02, which provides civil liability

for any person who:

      (1) knowingly presents, or causes to be presented, to an officer or employee of the state or a political subdivision a false or fraudulent claim for payment or approval;

      (2) knowingly makes or uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a political subdivision;

      (3) knowingly conspires to either present a false or fraudulent claim to the state or a political subdivision for payment or approval or makes, uses, or causes to be made or used a false record or statement to obtain payment or approval of a false or fraudulent claim;...

      314.   The State of Minnesota, by and through the Minnesota False Claims Act

program and other state healthcare programs, and unaware of Defendants' conduct, paid

the claims submitted by healthcare providers and third party payers in connection

therewith.

      315.   Compliance with applicable Medicare, Medicaid and the various federal

laws cited herein was an implied, and upon information and belief, also an express

condition of payment of claims submitted to the State of Minnesota in connection with

Defendants' conduct.  Compliance with applicable Minnesota statutes and regulations

was also an express condition of payment of claims submitted to the State of Minnesota.

      316.   As a result of Defendants' violation of Minn. Stat. § 15C.01, et seq. the

State of Minnesota has been damaged.

317. Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Minn. Stat. § 15C.01, et seq. on behalf of herself and the State of Minnesota.

318. This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim and merely asserts separate damage to the State of Minnesota in the operation of its Medicaid program.

## X.      PRAYER FOR RELIEF

WHEREFORE, Relator, the United States, and the State of Minnesota are entitled to damages from Defendants in accordance with the provisions of 31 U.S.C. §§ 3729-3733, and Plaintiff/Relator requests that judgment be entered against Defendants, including that:

    a. Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.;*

    b. Defendants pay an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty against Defendants of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 committed on or before November 1, 2015; and not less than $10,957 and not more than $21,916 for each violation of 31 U.S.C. § 3729 committed after November 2, 2015 pursuant to §3729 (a)(1) and 28 C.F.R. § 85.5 or as may be further adjusted;

c. Plaintiff/Relator be awarded the maximum amount allowed as a Relator share pursuant to 31 U.S.C. § 3730(d);

d. Plaintiff/Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d);

e. Plaintiff/Relator be awarded be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to available under the Minnesota False Claims Act, Minn. Stat. §§ 15C.01 *et seq.*;

f. Plaintiff/Relator be awarded the maximum amount allowed as a Relator share pursuant to Minn. Stat. 15C.13; and

g. The United States, Minnesota, and Plaintiff/Relator be granted all such other relief as the Court deems just and proper.

Respectfully submitted and dated this 14 day of November, 2017.

By: _____
Susan M. Coler, #217621
HALUNEN LAW
IDS Center
80 South 8th Street #1650
Minneapolis, MN 55402
Phone: (612) 260-5383
Fax:   (612) 605-4099
Email: coler@halunenlaw.com

Nola J. Hitchcock Cross
Wisconsin Bar No. 1015817
**Cross Law Firm, S.C.**
Lawyer's Building
845 North 11th Street
Milwaukee, WI 53233
Phone: 414) 224-0000

103

Fax: (414) 273-7055
Email: njhcross@crossalawfirm.com

Marcella Auerbach, Esq.
Nolan Auerbach & White P.L.
435 N. Andrews Avenue, Suite 401
Ft. Lauderdale, FL 33301
Phone: (954) 779-3943
Fax: (954) 779-3937
Email: Marcella@WhistleblowerFirm.com

*ATTORNEYS FOR CAMI LANE*